No. 65.—Henry H. Cumming, plaintiff in error, *vs.* Ann Cumming, Joseph Ware and others, defendants in error.

[1.] A mortgagee cannot enforce his mortgage against the property of a subsequent purchaser, as long as there is other property of the mortgagor remaining, sufficient to satisfy the mortgage debt. He can resort to the property sold *only* for what remains unpaid of his claim after the other mortgage estate is exhausted.

[2.] There is no contribution between purchasers *with warranty* upon *good* consideration, in succession at different times, of different parts of the estate of a mortgagor.

[3.] The proper test to determine the character of an instrument, whether testamentary or not, is, *does the legal estate in the property which is the subject of disposition, pass by it?*

[4.] Instruments purporting to be *deeds,* using words of conveyance *in presenti,* founded on a *good* consideration, *warranting* the title, sealed and *delivered* in the

Cumming *vs.* Cumming and others.

presence of *two* witnesses one of whom is *a justice of the Inferior court*, conveying *absolutely* to trustees, 1st, for the use of the grantor during her life, and 2d, for the use of certain relations in remainder, *are deeds*, and *not testamentary* papers.

In Equity. Tried upon bill and answers. Before Judge MERIWETHER. Richmond Superior Court. June Term, 1847.

Ann Cumming instituted her bill for foreclosure against George L. Twiggs and John P. Eve, executors of Grace Rowell, deceased, and Henry H. Cumming and Joseph Ware, as trustees.

The bill charged the following facts. That on the 1st July, 1833, said Grace Rowell executed a mortgage of certain lands and slaves to Thomas Cumming, to secure the payment of a certain promissory note; that on the 23d September, 1835, she made a conveyance of part of the mortgaged property to said Henry H. Cumming, subject to the trusts in the deed of conveyance mentioned; and that on the 29th of the same month, said Grace Rowell conveyed by deed another part of the mortgaged property to Joseph Ware, subject to the trusts in said last deed mentioned. These deeds purported to be founded upon love and natural affection for the respective *cestuis que trust* of Cumming and Ware, as well as upon the sum of ten dollars, and warranted the title against all persons claiming under the said Grace Rowell.

The bill further charged, that the note and mortgage had been duly transferred to said Ann Cumming, and that a considerable sum both of principal and interest still remained due; that said Grace Rowell died testate, and that said George L. Twiggs and Paul F. Eve were her acting executors.

The bill further alleged, that the portion of the mortgaged property not conveyed by said Grace, was insufficient to discharge the mortgage debt, and concluded with a prayer for the foreclosure of the mortgage and a decree for the sale of so much of the mortgaged property conveyed to Cumming and Ware respectively, in trust, with that in the hands of the executors, as might be sufficient to pay the debt still due.

Henry H. Cumming answered, admitting the material facts alleged in the bill, but insisting that no part of the property conveyed to him as trustee as aforesaid, by said Grace Rowell, ought in law or equity to be subjected to the payment of said mortgage debt, until the whole of the property included in said mortgage, and which remained in the hands of said Grace Rowell at and

after the execution of the deed to him, and which was then undisposed of by her, should have been exhausted by such payment; and that the complainant in the bill ought to be decreed to proceed, first, against the property in the hands of said Ware, contained in his said deed of the 29th of September, 1835, for the satisfaction of her mortgage debt.

The said Joseph Ware likewise answered the bill, admitting all the material facts alleged, but insisting that the instruments under which both himself and said Henry H. Cumming claimed to have portions of said mortgaged property conveyed to them respectively in trust as aforesaid, by the said Grace Rowell, were testamentary in their character, and if not, were voluntary conveyances; and that whatever rights their respective *cestuis que trust* derived from them, those rights all accrued at the same time, to wit, on the death of Grace Rowell, and had no reference to the dates and times of the execution of said respective instruments; and prayed that said Henry H. Cumming and himself, might be decreed to contribute ratably, according to the value of the property held by them, to the payment of said mortgage debt.

The cause was submitted to the jury upon the bill and answers; whereupon the presiding judge instructed the jury, that by the deeds of the 23d and 29th of September, 1835, Grace Rowell conveyed to Cumming and Ware, absolute titles to the property conveyed, vesting in them immediately; and that after the execution and delivery of said deeds she had no power by any act of her's, to affect in the slightest manner the titles to said property, beyond the life estate reserved; that her whole relation to the property was thereby changed, and that after the execution and delivery of said deeds, she had but a life estate in the property conveyed, whereas before, she had the absolute estate therein; but that notwithstanding the deeds to Cumming and Ware were of different dates, and their respective titles to the property thereby conveyed accrued at different times, they should be held in equity to contribute ratably to the payment of the mortgage debt, in proportion to the present value of the property held by them respectively under said deeds; and that said Grace Rowell, by said deeds, conveyed nothing more than her equity of redemption in the property embraced in each, subject to the reservation of her life estate. Decree accordingly.

To which charge of the Court below, Henry H. Cumming excepted, and assigned for error:

Cumming *vs.* Cumming and others.

1. That the presiding judge charged the jury, that "notwithstanding the deeds to this plaintiff in error, and the defendant in error Joseph Ware, were of different dates, and their respective titles to the property thereby conveyed accrued at different times, they should be held in equity to contribute ratably to the payment of the mortgage debt," and the jury returned a verdict in conformity with said charge; whereas this plaintiff in error says that he ought not to be held in equity to contribute any thing to the payment of said debt, nor should the property conveyed to him be subjected to the payment of the same, until the property conveyed to said defendant, Joseph Ware, shall have been exhausted in such payment.

2. That the presiding judge aforesaid, charged the jury, that such contribution should be made ratably in proportion to the present value of the property held by each, and the jury found accordingly; whereas this plaintiff says, that the contribution, if any be decreed, should be ratably in proportion to the value of the property held by each at the time of the several conveyances.

WM. LAW and C. J. JENKINS, for the plaintiff in error.

F. H. CONE, for the defendants in error.

Mr. JENKINS submitted and commented on the following authorities:

Conrad vs. *Harrison,* 3 *Leigh* 432; *Gill* vs. *Lyon,* 1 *Johns. Ch. R.* 447; *Clowes* vs. *Dickenson,* 5 *id.* 235, 241, 242; 10 *Sergt. & Rawle* 450; *Stoney* vs. *Shultz,* 1 *Hill Ch. R.* (*S. C.*) 500; *James* vs. *Hubbard,* 1 *Paige Ch. R.* 228; *Gouverneur* vs. *Lynch*; 2 *id.* 300; *Guion* vs. *Knapp,* 6 *id.* 35; 1 *Lomax Dig.* 296.

Mr. CONE, for the defendants in error, insisted,

1. That when property is mortgaged, and the mortgagor subsequently conveys for valuable consideration to different purchasers at different times, the purchasers must all contribute to the payment of the mortgage encumbrance ratably, according to the value of their respective purchases.  2 *Coke R.* (*new ed.*) 30; *Sir William Harbert's case;* *Vin. Abr. title* "*Contribution*" (*A*) 4, 6, 8, 9, 12, 25, 27; 1 *Eq. Cas. Abr.* 113; 1 *Story Eq. Jurisp. secs.* 477, 478, 483, 484; 2 *id.* 1233; 2 *Tuck. Com.* 49, 61; 2 *Rand. R.* 384; 7 *Mass. R.* 355; *American Law Mag. April No.* 1844, *p.* 64, 82;

4 *Monroe R.* 76; 3 *J. J. Marsh. R.* 44; 1 *Little R.* 317; 3 *Stewart R.* 248; 1 *Maddock R.* 233; 2 *Atk. R.* 448; 8 *Vesey R.* 391; 1 *Lloyd & Gould R.* 252; 2 *Younge & Coll. R.* 377; 1 *id.* 401; *Hobart R.* 45.

2. That in the case of volunteers, the foregoing doctrine applies with increased force, 1 *Rand. R.* 322; 1 *Hill Ch. R. (S. C.)* 260; 2 *id.* 210, 213.

Mr. LAW, in conclusion, for the plaintiff in error.

The counsel for defendants in error insists, that the rule which requires contribution between successive purchasers at different times of an encumbered estate, is firmly established in England. We contest this proposition.

The case in *Broke Abr. Suit. Pl.* 12, 13, was decided in the reign of Edward III., and under the influence of the feudal policy, viz: to preserve the number of the terretenants, and their capacity to respond to the feudal services incident to the lands. This case is the only direct authority from the English books adduced.

Sir William Harbert's case, *(3 Coke R.* 12,) when carefully examined, does not support the rule. That case announces various principles of equity; and, by way of illustration of the right of one heir to have contribution from another heir, uses the expression, "as one purchaser shall have contribution against another, so shall one heir against another." But as heirs take at the same time, the analogy is perfected only by the supposed case of purchasers who took at the same time. There is no direct adjudication on the point at bar in this case; the point did not exist in the case. These earlier decisions of the English courts were at law, and with direct reference to Acts of Parliament with which we have nothing to do.

The later chancery cases establish a different rule. See 1 *Ver. R.* 347; 2 *Sch. & Lef. R.* 315; *Hartley* vs. *O'Flaherty, Lloyd & Gould R.* 216; *Averall* vs. *Wade, ib.* 252; 10 *Eng. Ch. R. cond.* 498.

The doctrine stated in 2 *Story Eq. Juris.*, sec. 1233, a 4th ed., is not sustained by the authorities there cited for its support, as will appear by an examination of the remaining cases.

The rule established in America charges the land in the hands of purchasers in the inverse order of the purchases; and Chancellor Kent, in *Clowes* vs. *Dickenson*, although he refers to Sir William Harbert's case, treats the question at bar as *res intacta*. For

the American rule, see 1 *Johns. Ch. R.* 447; 5 *id.* 235; 10 *Serg. & Rawle* 453; 1 *Hill S. C. R.* 500; 1 *Paige R.* 228; 2 *id.* 300; 8 *Paige R.* 182, 277; 9 *id.* 173; 11 *Ohio R.* 444.

The rule contended for by the defendants in error, supposes that purchasers at different times stand in *equali jure*, and that equality is equity.

But is it true that their equities are equal? We think not.

1. It is conceded that there is no equality between the grantor and his grantee. Can a subsequent grantee acquire rights which his grantor had not? does he not take, subject to all the equities existing between his grantor and prior grantee? But the land of the first grantee had been exonerated by the remaining land in the hands of his grantor; how, then, shall the subsequent alienation raise different equities, and recharge the land that had been exonerated?

2. The first grantee purchases upon the security which the remaining land affords him. He has, to that extent, what is equivalent to a release from the mortgagee or incumbrancer; because equity will compel the latter to go first upon the unsold land. Can the second purchaser, who unites with the grantor to deprive him of that security, be considered in equal equity with him? So far from it, some of the authorities denounce it as a fraud on the first purchaser.

3. The subsequent purchaser is aware of the condition of the land he buys; he takes it with his eyes open. Upon what principle can he be said to stand on an equality with the first?

4. Shall the fact that his act, combined with the grantor's, has defeated the rights of the first purchaser, or shall a principle which defeats all *certainty* in the rights and title of property, find their apology in this strange notion of equality?

But even if the equities of these parties were equal, the well established maxim, *qui prior est in tempore, potior est in jure*, entitles the first purchaser to a preference, and to exemption from contribution. We rest upon this principle.

We will now consider the American authorities adduced by the defendants in error; and we maintain that there is not one of them which militates against the rule for which we have been contending. We will take them up *seriatim*, and endeavour to explain them.

(Here the counsel reviewed and examined the cases.)

If we have succeeded as to the question when considered as to

purchasers for value, then the. inquiry is, can the case at bar—a case as between beneficiaries or volunteers—be distinguished? What is the rule? The first purchaser shall be preferred because as between him and the grantor there is no equality; the grantee sits as much in the seat of his grantor, as the heir does in that of the ancestor, and the act of the grantor and subsequent grantee, shall not throw back a burden on the first grantee from which he had been discharged. Does not the reason apply in all its force to the case at bar? After the deed was executed to the plaintiffs in error, was not the remaining property in the hands of Mrs. Rowell first liable to discharge the incumbrance? Is not this instrument a deed? It has the form of a deed, and may have the effect and operation of a deed; if so, it is not testamentary—that is the test of the rule. The reservation of a life estate to the grantor proves it a deed; the legal estate was by this instrument conveyed absolutely to the trustee—the possession and enjoyment by the present *cestuis que trust,* to take effect after the determination of the life interest reserved to Mrs. R. Vested rights and absolute interests, irrevocable by the grantor, passed by this instrument. It contains, too, a covenant of warranty; shall the grantor be permitted by a subsequent sale, to annul and invalidate that covenant? We apprehend that this is a strong and decisive feature in this case. In the construction of written instruments, the intention must be gathered from the instrument and not from extraneous evidence or conjectural hypothesis. It was not the mere equity of redemption which this deed transferred; it has been decided by this Court, that a mortgage in Georgia is but a security for the debt, the legal title remaining in the mortgagor. 1 *Kelly* R. 193. The rule of the interference of a court of equity as between volunteers, seems to us to have been misconceived by the argument for the defendants in error. We understand it to be, that where the conveyance has passed, and an absolute interest vested, a court of equity will enforce the equitable interests, protect the rights under, and give effect and performance to instruments, although the consideration has been purely voluntary. 6 *Vesey Jr.* R. 656; 1 *Johns. Ch. R.* 336, 337.

It is expressly said in Sir William Harbert's case, that the consideration for the purchase in these cases, is immaterial to the question; and Chancellor Kent, in *Clowes* vs. *Dickenson,* cites this principle in that case without objection. It is true that some of the reasons in favour of the rule for which we contend apply more

strongly in the case of purchasers for value; but there is quite enough to establish the same rule, although the conveyance be voluntary. No adjudicated case has been adduced in support of a distinction.

*By the Court.*—LUMPKIN, J., delivering the opinion.

This cause came on for a hearing before Judge Meriwether, in Richmond Superior Court, from which it appeared, that on the first day of July, 1833, Grace Rowell gave to Thomas Cumming a mortgage on certain lands and slaves, to secure the payment of a promissory note for nine thousand dollars, due the first day of July, 1836, with interest payable thereon annually. That on the 23d of September, 1835, said Grace Rowell made a conveyance of part of the mortgaged property to Henry H. Cumming, subject to the trusts in the deed of conveyance mentioned, the deed purporting to be founded upon love and natural affection as well as the sum of ten dollars, and containing a clause of warranty of the title against all persons claiming under the said Grace. That on the 29th of the same month, said Grace conveyed by a similar instrument, another part of the mortgaged property to Joseph Ware, subject to the trusts in this last deed mentioned. That said note and mortgage have been duly transferred to complainant, and there is yet a considerable amount of principal and interest due thereon. That said Grace Rowell has died testate, and that George L. Twiggs and John P. Eve, are her acting executors. The bill seeks for a foreclosure of said mortgage, and a decree for the sale of so much of said property mortgaged as may be sufficient to pay the balance of the debt yet due; the estate of said Grace in the hands of said executors not being sufficient for that purpose.

The defendant, Henry H. Cumming in his answer, admitting the material facts contained in said bill, insisted, that no part of the property conveyed to him as trustee as aforesaid, by Grace Rowell, ought in law or equity to be subjected to the payment of said mortgage debt, until the whole of the property included in said mortgage, and remaining in the hands of the said Grace Rowell at and after the execution of the deed to the defendant, and then undisposed of by her, should have been exhausted by such payment, and that the complainant should be decreed to proceed first against the property in the hands of Joseph Ware,

contained in his deed of the 29th of September, 1835, for the satisfaction of said debt.

The defendant, Joseph Ware, likewise admitting all the material facts, insisted that the instruments in writing under which both he and the defendant Cumming, claimed to have property conveyed to them by Grace Rowell, were testamentary in their character, and if not, were voluntary conveyances, and that whatever rights the several *cestuis que trust* derived from them, those rights all accrued at the same time, to wit, at the decease of the said Grace Rowell, and had no reference whatever to the dates and times of the execution of said respective instruments; and prayed that Henry H. Cumming and himself be decreed to contribute ratably, according to the value of the property held by them, to the payment of complainant's demand.

The cause being before the jury, the presiding judge instructed them, that by the deeds of the 23d and 29th of September, Grace Rowell conveyed to Cumming and Ware, absolute titles to the property therein mentioned, *vesting immediately*, and that upon the execution and delivery of said deeds, she had no power by any act of her's, to affect in the slightest manner the titles to said property, beyond the life estate which she reserved to herself; that her whole relation to the property was changed; that before, she had an absolute fee, whereas now, she held only an estate for life. That notwithstanding the deeds to Cumming and Ware were of different dates, and their titles accrued at different times, they should be held in equity to contribute ratably to the payment of complainant's debt, in proportion to the present value of the property held by them respectively under said deeds, and that the said Grace Rowell, by said deeds, conveyed nothing more than the equity of redemption in the property embraced in each, subject to the reservation of her life estate.

A verdict was rendered by the jury corresponding to said charge, whereupon the defendant, Henry H. Cumming, excepted to the judgment and charge of the Court, 1st, because he is not liable in equity to such contribution, and 2nd, because such contribution, if made at all, should not be made in proportion to the value of the property at the time of the decree.

[1.]     The first point to be settled is, whether or not there be any fixed and well defined English rule upon this subject; for if it be the law of the mother country, as adopted in this, in 1776, we are bound by it of course, whether it be reasonable or otherwise.

It was well remarked, however, by Lord Denman in his judgment in the House of Peers in Mr. O'Connell's case, " that a large portion of that legal opinion which has passed current for law, falls within the description of 'law taken for granted;' and that when in the pursuit of truth we are obliged to investigate the grounds of the law, it is plain and has often been proved by recent experience, that the mere statement and re-statement of a doctrine, the mere repetition of the *cantilena* of lawyers, cannot make it law, unless it can be traced to some competent authority, and if it be irreconcilable, to some clear legal principle."

It is conceded that where there is a lien upon different parcels of land for the payment of the same debt, and some of those lands still belong to the person who in equity and justice owes and ought to pay the debt, and other parcels of the land have been transferred by him to third persons, his part of the land, as between himself and them, shall be primarily chargeable with the debt. *Gill* vs. *Lyon*, 1 *Johns. Ch. R.* 447; *Stoney* vs. *Shultz*, 1 *Hill Ch. R.* 500; *Commercial Bank of Erie* vs. *Western Reserve Bank*, 11 *Ohio (Stanton) R.* 444; *Hartley* vs. *O'Flaherty, Lloyd & Gould R.* 216; *Temp. Pl.* 19.

No one seems to dispute that this doctrine is altogether equitable and proper as to the original owner; but if he has sold or transferred different parcels of land at different times to different persons, as incumbrancers or purchasers, the question is, how are they to be charged as between themselves?  Is the lien to be borne ratably between them, according to the relative value of their respective estates? or in the reverse order of the liens of the transfers to them ? that is to say, the land last sold to be first charged to its full value, and so backward until the debt is fully paid.

Judge Story seems to incline strongly to the former opinion, and says that the doctrine has been asserted in the ancient as well as the modern English cases upon the subject.  2 *Story Eq. Jur.* sec. 1233.   And the able editor of the American Law Magazine, declares, that the following rules of proportion or contribution, as laid down in the Year-Book, and repeated in Sir Edward Coke's Reports, are now firmly established in Westminster Hall.

" 1. That the feoffee of a conusor, or person who has charged his land with an incumbrance, may throw the whole charge upon the conusor.

" 2. That the feoffees may claim contribution from each other

towards the extinguishment of such a charge without regard to the time of their respective purchases; and

"3. That the heir of the conusor, stands in this respect, in the place of his ancestor, being liable to all his disabilities, and entitled to claim no benefit which the ancestor could not have demanded." 3 *Amer. Law Mag.* 71.

I would remark, that the only cases cited, are from Broke's Abridgment and Sir Wm. Harbert's case, 3 Reports, 13 a.; and further, that I have carefully and laboriously examined the authorities referred to in support of this doctrine, said to be rooted and grounded in the English law, and I must say, with the most perfect distrust of my own opinion when weighed in the balances against such fearful odds, that I do not find the doctrine so fixed in England as to make it necessarily the law of this Court. Indeed, the comments of the learned writer last quoted, show conclusively, that to adhere to the precedents from Broke and Coke, would be to set up "a misconception of the law, in destruction of the law." Moreover, a rule justified perhaps by the feudal policy in which it originated, would be wholly inapplicable to the commercial spirit of the present age.

The case of *Hamilton* vs. *Royal*, 2 *Schoales & Lefroy*, 315, teaches, undoubtedly, a contrary doctrine. It is true this is an Irish case, but if the decisions of Lord Redesdale (Mr. Milford) are not evidence of what the law is in Britain, what judges' are? In this case the principle is distinctly laid down, that the second purchaser takes subject to all the equities to which the vendor was liable, and the doctrine as to the exoneration of one estate by another, is certainly carried very far.

So also in *Averall* vs. *Wade*, 1 *Molloy* 567; *Lloyd & Gould R.* 252, where a party seised of several estates and indebted by judgment, settles one of the estates with a covenant against incumbrances, and subsequently acknowledges other judgments, it was held that the prior judgment should be thrown altogether on the unsettled estates, and that the subsequent judgment creditors had no right to make the settled estate contribute.

While this question then cannot be said to be *res intacta*, we may well conclude that it is *res non adjudicata*, and that the Courts in this State are free to follow either of the rules, untramelled by authority.

Chancellor Kent maintains, that as between several purchasers in succession, at different times, there is no equality, and conse-

quently no contribution; thus, for instance, if there be a judgment against a person owning at the time three acres of land, and he sells one acre to A, the two remaining acres are first chargeable in equity with the payment of the judgment debt, and that too whether the lands be in the hands of the debtor himself or of his heirs. If he sells another acre to B, the remaining acre is then chargeable in the first instance with the debt as against B, as well as A, and if it should prove insufficient, then the acre sold to B ought to supply the deficiency, in preference to the acre sold to A, because when B. purchased, he took the land chargeable with the debt in the hands of, the debtor, in preference to the lands already sold to A. *Clowes* vs. *Dickenson, 5 Johns. Ch. R.* 235.

Is it Mr. Justice Story who is in the right, and Chancellor Kent who is in the wrong on this point? or is it Chancellor Kent who is in the right and Mr. Justice Story who is in the wrong? for the difference between the two is so essential that *both* cannot, we apprehend, be in the right.

To my mind, the proposition as enunciated and illustrated by the chancellor, is unanswerable, namely, that it cannot be in the power of the debtor, by the act of assigning or selling his remaining land, to throw the burden of the judgment, or a ratable part of it, back upon the first purchaser.

This leading case, and the satisfactory reasoning upon which it is founded, is destined to exert a controlling influence over the courts of this country. In New York, the principle thus proclaimed, has been steadily and constantly acted on, without ever having been doubted or modified, much less overruled, viz., that where there is a lien upon different parcels of land for the payment of the same debt, and some of these lands still belong to the person who in equity and justice ought to pay such debt, and a portion has been transferred by him to other persons, his land shall be first charged, and if he has sold the several parcels at different times, they are to be charged in the inverse order of their alienations. *James* vs. *Hubbard,* 1 *Paige R.* 228; *Gouvernuer* vs. *Lynch,* 2 *id.* 300; *Guion* vs. *Knapp,* 6 *id.* 35; *Skeel* vs. *Spraker,* 8 *id.* 132; *Patty* vs. *Pease, ib.* 277; *Schryver* vs. *Teller,* 9 *id.* 173.

In Virginia, up to 1830, their courts had uniformly held, that all the alienees of the lands of a debtor, bound by a judgment or recognisance, no matter in what order the alienations were made, are bound to bear equally the burden of satisfying the lien by mutual contributions *pro rata*, according to the value of the prop-

erty held by each; all being considered as *in equali jure*, without regard to the priority of their purchases. *Thwealt's adm'r* vs. *Jones' adm'r, &c.*, 1 *Rand. R.* 332; *Chamberlayne* vs. *Temple*, 2 *id.* 400; *Beverly* vs. *Brooke et al., Same* vs. *Pickett et al.*, 2 *Leigh R.* 442; 2 *Tuck. Com.* 491, 492.

But in *Conrad* vs. *Harrison*, 3 *Leigh. R.* 532, this principle, which had been considered well settled, underwent the revision of the Court of Appeals, and the consequence was a reversal of their previous adjudications, upon the authority of the several cases "so powerful in their reasoning and so very ably handled" by Chancellor Kent, especially that of *Clowes & Dickenson*, which seemed to have escaped both the bar and the bench, no reference having been previously made to them.

Carr, Justice, in delivering the opinion of the Court in the case of Conrad, thus strongly puts the point: "Suppose a man had bought a thousand acres of land at the price of $10,000; that he had mortgaged it for the purchase money, and had paid all of it but $1,000, and another wants to buy a *hundred* acres of his land; in making his contract, it will not weigh a feather in the scale, that the whole tract is still bound for $1,000, while he knows that nine hundred acres still remain in his vendor's hands, liable for this balance, before the hundred acres he proposes to buy can be charged; he would without hesitation give the full price and pay the money, satisfied that the lien could never touch him. But suppose the vendee of the thousand acres had sold to different purchasers nine hundred acres, and offered the last hundred to another with the original lien still on the tract; assuredly his prospects in the purchase would be very different; and common prudence would induce him to pause till he should see clearly how the incumbrance was to be met. It seems plain, therefore, that the successive purchasers or incumbrancers do not stand *in æquali jure*, and that no one who comes after can call on those before him for contribution."

It is a little singular that this court, as did Chancellor Kent, consider Sir William Harbert's case, which is invariably referred to as the corner-stone of the contrary doctrine, as inculcating these very principles of equity, when thoroughly examined and well understood.

In *Nailer* vs. *Stanley*, 10 *Serg. & Rawle R.* 450, the Supreme Court of Pennsylvania quote with approbation the decision in *Clowes* vs. *Dickenson*, and give in their adhesion to the doctrine.

One *Vanleer* was seised of certain lands and tenements; his creditors obtained a judgment against him for a large amount; subsequent to the rendition thereof, he conveyed a portion of these lands to *Nailer*, and afterwards another portion to *Stanley;* the sheriff, by virtue of an *alias venditioni exponas,* issued under said judgment, sold the tract of land conveyed to *Stanley,* which discharged the debt, and the land conveyed to *Nailer* was thereby exonerated. *Stanley* brought his action of assumpsit against *Nailer* for contribution.

*Duncan, Justice.*—" This is not a case of contribution ; no contribution lies between the parties. The plaintiff below could neither by *audita querela, scire facias,* or bill in equity, compel a contribution. Why should the second purchaser come in as the first ? He can stand in no better situation than *Vanleer.* He took the land subject to all the incumbrances against·*Vanleer;* he was bound to look to the state in which *Vanleer* and in which *Nailer* stood. How then did they stand ? Excluding this property sold to *Nailer,* there was land enough held by *Vanleer* to satisfy this judgment. In principle, *Nailer* cannot be called on for contribution. It is not consistent with justice that Stanley should put *Nailer* in a worse state than he stood with *Vanleer;* or that *Vanleer* could convey to *Stanley* any·better right than he had himself." See also *Corporation* vs. *Wallace,* 3 *Rawle R.* 109 ; *Donley* vs. *Hays,* 17 *Serg. & Rawle R.* 400.

This doctrine came under discussion in *The Commercial Bank of Lake Erie* vs. *The Western Reserve Bank and others,* 11 *Ohio R.* 444, and after the most elaborate argument, the Supreme Court of that State held, that lands lying under a judgment lien, which have been sold to purchasers, must be sold to satisfy the judgment, in the inverse order of the dates of the purchases.

*By the Court.*—" Where debtors sell lands subject to judgment lien, they confer an equity upon the purchaser, to exempt what he purchases from the burden, until all the other lands subject to the lien shall be exhausted. Subsequent purchasers acquire the same equity but subordinate to that of older purchasers, *because posterior in time.*".

In *P. & M. Bank* vs. *Dundas et al.,* 10 *Ala. R.* 668, the same principle is distinctly recognised. W. R. Hallett filed a bill to foreclose a mortgage on a tract of land, executed to him by one Gaggam. Subsequent to the execution of the mortgage, to wit, on the 16th November, 1835, Gaggam conveyed a portion of the

mortgaged premises to one P. W. Brown; and on the 9th of April, 1836, another portion to Burns & Brown & Edmonds; and at other subsequent dates, other portions, though to other persons. It appeared that the complainants held by a derivative title, under the conveyance from Gaggam to Brown of 16th November, 1835; and the P. & M. Bank also by a derivative title under the conveyance of the 9th April, 1836. The matter being referred to the master, he reported, that the portion of the mortgaged property not embraced in any of the deeds aforesaid, should be first sold to satisfy the mortgage, and that the property embraced in the other deeds should be sold in the inverse order of the sales, viz : that the portion of property last in Gaggam's possession should be first sold. The master subsequently declares, that the land held by the P. & M. Bank should be last sold ; and this is the portion of the report which is alleged to be erroneous.

"In our opinion," says Ormond, Justice, " the objection here taken is valid. The leading principle of the decree is, that where different parcels of mortgaged premises have been sold at different times by the mortgagor subject to the mortgage, the sale for the satisfaction of the mortgage is to be made in the inverse order of the alienations. If, in this case, the alienees from Gaggam had retained the land, no difficulty whatever could have arisen, *as the sale would have been made* in the order of *the alienations, commencing with the last, if no other fact existed disturbing the operation of this equitable principle."*

Several cases have been cited, which are supposed to militate against this doctrine, and among the rest three from Kentucky, namely : *Hughes* vs. *Graves, &c. Litt. R.* 317 (1822) ; *Morrison's adm'r* vs. *Beckworth,* 4 *Monroe R.* 73 (1826); *and Poston* vs. *Ewbank,* 3 *J. J. Marshall R.* 42 (1829).

The first of these precedents is undoubtedly in point; mortgaged slaves were sold to different purchasers at different times, and the court held that while all the property was liable in the hands of the respective purchasers to the demand of the mortgagee, yet as between the purchasers themselves, equity would enforce contribution on the principles of equality. It is worthy of note, that this case was decided at an early period, almost cotemporaneously with *Clowes* and *Dickenson,* and without either argument or authority, as appears from the report.

In *Morrison* vs. *Beckworth,* it is said, " that when a mortgage is made to bear upon purchasers of different parcels from the mortga-

gor, that they are bound to contribute in proportion to the value of the share that each holds, fixing that value at the date of the mortgage; but the bare statement of the facts will show that the question of contribution did not and could not arise in the case, and that consequently the expression relating to it which fell from the court, was the mere suggestion or *obiter dictum* of Judge Mills.

John and Upton Beckworth exhibited their bill, to be relieved against two judgments at law of five hundred dollars each, obtained against them by one Churchill on two notes, executed by them to Hugh Morrison. The injunction was dissolved pending the bill, as to both these judgments, and was reinstated as to one of them by two of the judges of the Court of Appeals, and on the final hearing it was dissolved as to that also; but by the decree, Churchill was not allowed to take out execution until he entered into bond in the clerk's office, with surety approved by the clerk, conditioned to refund the money, if the lot for which the notes were given was ever lost or taken away by any claim superior to that sold and conveyed by Morrison to the Beckworths; and to reverse this decree, Churchill sued out the writ of error.

Judge Robertson, in delivering the opinion of the court in *Poston* vs. *Ewbank*, reiterates the rule, that all who purchase from the mortgagor, should be compelled to contribute to the extinguishment of the debt of the mortgagee, in proportion to the value of the interest which each holds in the estate, and he cites *Stevens* vs. *Cooper*, 1 *Johns. Ch. R.* 430, and *Morrison* vs. *Beckworth*, 4 *Monroe R.;* but the judge himself declares, that the principle did not apply to the case before him.

And well he might. One *Ritchie* purchased from *Calloway* certain houses and lots in the town of Winchester, obtained a conveyance and gave to him his bonds for the consideration; one of these bonds having been assigned to *Ewbank*, he obtained a judgment on it, and caused a *fieri facias* to issue, which was returned " no property." In the meantime, *Ritchie* had mortgaged the houses and lots to *Poston*, who had procured a decree for foreclosing the mortgage. Before the sale of the property under the decree, *Ewbank* filed his bill against *Ritchie's* representatives and *Poston*, asserting an equitable lien on the houses and lots, and praying for a sale subjecting the property to his judgment. *Poston*, the mortgagee, proceeded with the sale, and *Duncan* and *Decreet* and himself bought the property, each buying a separate portion of it. *Poston*, in his answer to *Ewbank's* bill, alleged that *Duncan, Decreet*

and himself agreed on the day of sale to buy the property, and to be each responsible *pro rata* for the extinguishment of *Ewbank's* lien, provided it should be enforced; and he therefore made his answer a cross bill against *Duncan* and *Decreet*, and asked for a decree against them to enforce contribution, according to their express stipulation to that effect.

This would be a clear case for contribution independently of the agreement, the parties having purchased at *the same time*, separate portions of property to be sure, but all equally subject to the equitable lien of *Ewbank*.

In the two last of these cases, *Stevens & Cooper* is adduced in support of the opinion thrown out by the court; but that case, as well as the previous one in the same volume, of *Cheeseborough* vs. *Millard*, *p*. 409, relate to a different head altogether of equity jurisprudence. They treat of the right of contribution as between a mortgagee or judgment creditor who releases a portion of the land bound by his incumbrance from its lien, and a subsequent purchaser or incumbrancer, of the part not released; and the rule there established is, that the mortgage in such case could only be levied *pro rata*, as the mortgagee could not be permitted by his own act, wittingly to jeopardize the situation of one of the grantees. *Pothier* has, in his *Treatise on Obligations*, clearly elucidated this doctrine of the *Civil law*. 2 *vol.*, 61, 62, 63, 64, 65. It rests upon the maxim, *qui sentit commodum, sentire debet et onus*.

It is proper to state, that I find that so late as 1842, the courts in Kentucky still adhere to their position. In *Burk and others* vs. *Chrismen and others*, 3 *B. Monroe R.* 50, the court say, "that each subsequent purchaser of a portion of the land subject to the express lien against the original vendor, took it *cum onere*, and was therefore liable to contribution according to the value of his parcel when he bought it.

It is obvious, however, that this question has never been examined in any of the cases cited from Kentucky, in a manner suitable to its importance. In none of them was it directly made by the pleadings, nor treated by the court as *cardo causæ*, the very point of the litigation.

The cases in chancery in South Carolina have been relied on in the argument, in behalf of the defendant in error, particularly *Screven* vs. *Joyner, Ex'r. &c. and others*, 1 *Hill Ch. R.* 252, and *Thompson and Wife* vs. *Murray and Wife*, 2 *id.* 204. We do not perceive that either of these cases afford any help to that side; on

the other hand, *Stoney* vs. *Shultz and others*, 1 *Hill Ch. R.* 465, is a strong precedent for the plaintiff in error.   There the counsel on the appeal *consented* to modify the decree, in accordance with the leading views already intimated in this opinion.   And Judge Johnson, in delivering the judgment of the court, says, "I do not regard it as depending entirely on the concession of counsel.   As between the complainants and defendants, the whole is equally liable, but amongst the defendants themselves, there is an equity which ought to be kept in view.   Knowing of the mortgage and judgments, the first purchasers must necessarily have looked to the residue of the land as a security for the satisfaction of them. Every subsequent purchase diminished the amount of this security, *and operated as a fraud upon the first purchasers.*"

I deem it a waste of time to examine the case of *Taylor &c Wilson* vs. *Porter*, 7 *Mass. R.* 354.   It is true that Chief Justice Parsons in the close of his opinion does state, that when there are two or more grantees under the mortgagor, whether severally or in common, if either pay off the mortgage the other shall be holden to a reasonable contribution; and the judgment was right upon the case before him.

One *Uriah Cotting* and others, (who afterwards released to *Cotting,*) being seised in fee of certain premises, sold them to *Taylor &c Wilson*, who executed a mortgage to secure to the vendor the notes given in payment.   *Taylor &c Wilson* subsequently sold to *Newhall &c Lincoln*, who gave them a mortgage of the same lands, conditioned to save them harmless from the debt to *Cotting.*   *Lincoln* conveyed one undivided moiety of the premises to *Porter*, the tenant, who undertook to discharge and pay one half of the purchase money due to *Cotting.*   *Newhall* conveyed the other half to *Robbins &c Inman*, who undertook to pay the other half of *Cotting's* debt.   *Taylor &c Wilson* now sought to foreclose their mortgage upon the whole of the land, for the sum of $442 10, remaining unpaid upon the original debt.   No argument was had, and the opinion of the court was, that judgment be rendered for the demandants for the aforesaid balance, with the interest.

Reason, as well as the weight of authority, repudiates the proposition that purchasers at different times, of property under a lien against the vendor, stand in equality as it respects the incumbrance, and must contribute proportionably to its discharge.

"Does a subsequent grantee," asks the learned editor of the periodical heretofore quoted, "acquire rights to which his grantor was

not entitled? If so, to what principle of law or equity are they to be referred? It would be difficult to invoke any support for the affirmative of this inquiry from that system, one of whose leading rules in cases of this kind is, that priority in point of time, gives superiority of right; but as the ground upon which the position is maintainable, is supposed to exist in the elementary maxim which directs the chancellor, that equality is equity, a principle which would also appear of early adoption by the common law, (see the Year-Books cited in 3 Reports, 13 a.) let us see what the equality is between grantees at different times of the same grantor.

" Part of a tract of land bound by a judgment or mortgage to an extent short of its whole value, is conveyed away, the grantee paying the full price, satisfied that the remaining portion is adequate for the discharge of the incumbrance. The law here would place the grantee in precisely the same condition as if he had expressly stipulated for, and received a release of, the lien of the incumbrance on the portion purchased by him from the creditor of his grantor; for if an attempt were made to levy the debt on the land of the grantee, upon a proper application it would be ordered to be raised exclusively from the part remaining with the grantor. Shall a purchaser, then, confiding in this principle of equity which would exonerate him from risk, where none was contemplated, or if foreseen, left to be provided against by the proper working of the law, be placed in a worse situation by the act of his own grantor, which he cannot prevent? A subsequent grantee has his position clearly defined, and he would buy with his eyes open, as to every liability of the land in the hands of the original owner. He stands in the place of the person under whom he claims; and where is his right as to a division of the burden, when he must be aware, that by the operation of the first grant, the land remaining with the grantor has become charged with the whole incumbrance? And yet under the authority of the case in the Year-books, this inequitable consequence results, from holding all the purchasers liable for the charge, in the proportion of their respective ownerships."

Again. " This construction tends to unsettle the rights of a purchaser buying in the confidence of full security, by exposing him to loss from events which he can neither foresee nor prevent. A construction which at a glance must strike us as leveled at that certainty which is the life of the law, demands a more powerful

support than that offered by Lord Coke, which, by the bye, is the only one which he attempts to give; for it is plain, that the situation of the first purchaser is thus made precarious in the extreme. As long as his vendor remains seised of the residue of the land bound, the first vendee is secure; but by a second conveyance, a liability springs up, uncertain in its extent, and on that account most harassing, and thus the enjoyment of his estate is impaired by a cloud suspended over it, which may at any moment burst and pour out, if not destruction, at least considerable damage and annoyance. Nor can it be replied, that the first vendee may always protect himself at the time of his purchase, by procuring a release of the lien on his portion. The incumbrancer may refuse to afford him this accommodation; but admitting the practicability of obtaining a release—suppose it omitted from negligence or mistake—it is precisely for such unforseen cases that the law should lay down a correct rule; for if the agreements between man and man comprehended every possible contingency, there would be little left for the exposition of the judge. A powerful motive, therefore, derivable either from the reason of the law, or from those technicalities which are so interwoven with the principles of real property, that they cannot be rooted up without danger to the whole trunk of the system, would seem requisite to sustain a rule so illusive in its effects, and so destitute of any thing like an equitable operation." 3 *Amer. Law Mag.*, title *Contribution.*

No apology, I trust, is necessary for the length of this extract; if so, my excuse is to be found in the fact, that we are about solemnly to settle a prominent principle, which merits our most careful consideration from its magnitude, as well as the amount involved in it, in the case at bar; and about which, not only the two mightiest minds of the legal science, but the most reputable courts of the country, have come to contrary conclusions.

Whether we look, then, to the weight of authority, or the reason of the thing, there would seem to be no equality and no contribution between several purchasers in succession at different times.

The only remaining inquiry is, whether there be any difference between purchasers for a *good* and purchasers for a *valuable* consideration? From the *apparent* hardship of this case, I have struggled hard to persuade myself that there was; and it is certain that there are reasons for the rule which we are about to establish, which apply to the one class and not to the other. Still

I am unable to suggest a sound legal distinction which would be satisfactory to my own mind, for taking *donees* out of the operation of the rule.

*Donees are purchasers.* " If I give land freely to another, he is in the eye of the law a purchaser, for he comes to the estate by his own agreement; that is, he consents to the gift." 2 *Black. Com.* 241. " The title to land is either by purchase, to which the act or agreement of the party is essential, or by mere act of law." *Hargrave* 2 *note to Coke on Litt.* 18, *b.* " Estates can accrue only by two means, *descent* and *purchase;* which latter word, in legal signification, includes every kind of title thereto, except only hereditary transmissions ; it amounts, therefore, to no more than saying, that a man is either by deed, devise, escheat, and the other means allowed by law, the first acquirer in his family of the estate in question, or else derives it from his ancestors." 2 *Wood. Laws of Eng.* 150.

The books make no discrimination between the two, except, perhaps, as it regards *creditors* and *bona fide purchasers.* Sir William *Harbert's case,* in the exchequer, put them upon the same footing. The *second resolution* of the court was, " If land of the *heir* be seized in execution upon a recognisance of the ancestor, he shall not have contribution against a *purchaser* of his ancestor, *although he came in without consideration,* and although the *heir* be not charged as *heir,* but partly as *terretenant;* but one *purchaser* shall have contribution of another *purchaser,* and one *heir* against another *heir,* because they are *in æquali jure.*"

Chancellor Kent, in commenting on this case, says " the *heir* shall not have contribution against *purchasers,* for the heir sits in the seat of his ancestor; and the rule is the same, *though the purchaser take the land without consideration.*" And he cites *Harvey* vs. *Woodhouse,* 1731 *Select Cas. in Ch.* 3, 4, *S. P.*

Indeed, the very foundation principle upon which the rule rests, to wit, that the residue of the property in the hands of the *vendor* or *donor,* is first chargeable in equity with the burden of the payment of the prior lien or incumbrance, protects alike *donees* as well as *purchasers for price.* And this concession alone would seem to be conclusive upon the subject.

Besides, one of the strongest grounds upon which the rule is founded, namely, the harassing uncertainty which would attend the tenure of property and which the law so much abhors should the opposite doctrine obtain, applies with equal force to *volunteers* and

to purchasers for value.   Every gratuity is not a benefit; and one might well hesitate before  he would consent to receive property, especially female slaves at  the  South, and buy, and sell, and  get credit upon  the  possession of it, and be  at all the  trouble and expense of rearing the increase, if he were at last liable to have it swept from him by the subsequent acts and alienations of  the *donor*. And whether the intervening space  between the transfers be *six days* or *six years*, can make no difference in principle.

I have already said, that as it regards creditors and  purchasers *without notice*, the law discriminates between volunteers and  purchasers for money.   To  be  accurate, it may be proper to  notice another distinction.   While the assistance of the  Court cannot be had *without consideration* to  enforce *executory* agreements—as for instance the payment of a promissory note from a father to a son— still, if the  contract is *executed*, or  the  legal  conveyance actually made, *though without consideration*, the rights of the party in inter- est will be  protected and  enforced.   *Bold* vs. *Corbett, Pre. in Ch.* 84; *Lechmere* vs. *Carlisle*, 3 *P. Wills.* 222; *Ellison* vs. *Ellison*, 6 *Vesey R.* 662 ; *Bunn* vs. *Winthrop*, 1 *Johns. Ch. R.* 337.

But, admitting that the  general rule as between *donees* and [2.] purchasers for valuable  consideration, was different, is there not that in the present case which would take  it out of its operation ? The deed to Cumming is dated six days before the conveyance to Ware ; in it, Mrs. Rowell warrants and obligates herself to defend the title to the whole of the property, real and personal, thereby conveyed unto the said Henry H. Cumming, his heirs, executors, and administrators in trust, &c., *against all persons claiming  under her*.   Could  she, by any subsequent transfer voluntarily entered into, defeat the liability thus undertaken ?   Did it not constitute a burden upon her  estate ? and  did  not after donees take it *cum onere ?*

That a *guarantor* or *warrantor* is  to be considered in the light of a *debtor*, so as to  prevent a  voluntary  alienation of his  property, there can be no doubt.   This proposition was extensively discussed and definitely affirmed by the  Court of Errors of New York, in the case of *Van Wyck* vs. *Seward*, 18 *Wend. R.* 375.   " The objection," says Mr. Justice Bronson, " is, that Van Wyck was not a *creditor* of Seward at the date of the deed, because it was then uncertain whether he would  ever have a cause of action on the *covenant*.   Let us see where this doctrine would carry us.   If one promise to  pay money at  a future day, he may pay before the

credit expires; and until that time arrives, it is uncertain whether an action will ever accrue on the promise. The contract of surety only creates a *contingent* liability; until the principal is in default, it is uncertain whether an action will ever accrue against the surety. The drawer of a bill of exchange is only bound to pay it upon a contingency which may never happen; and so it is with the indorser of negotiable paper of all kinds. The contract of indemnity is another case where an action may never accrue upon the undertaking. In these and all other cases depending upon contract, the person to whom the engagement is made, is as much a creditor as though he had a debt in which the right of action already existed. *There is no reason why he should not be entitled to the same protection in the one case as in the other.* In the language of Chief Justice Mellen, in *How* vs. *Ward,* "Although he cannot maintain an action on the contract until it has been violated, *still he has an interest in the property conveyed,* as a fund out of which the debt ought to be paid."

The case of *Lomas* vs. *Wright,* 2 *Myl. & Keene R.* 769, *(*8 *Eng. Ch. R. cond.* 221,*)* would seem to define accurately the position of a covenantee in a voluntary conveyance or settlement. *He is declared to be a creditor;* not entitled to compete, to be sure, even with simple contract creditors for a valuable consideration, but as against heirs, &c., *he has the right to stand in the place of mortgagees who have exhausted the fund provided by the testator* for the payment of *simple contract debts,* &c.

Shall it be replied, that both transfers contain a similar clause of warranty? That answer is met by the case of *Guion* vs. *Knapp,* 6 *Paige R.* 39. The chancellor says, "if a mortgage is a lien upon 200 acres of land, and the mortgagor conveys 100 acres thereof to A, the 100 acres which remain in the hands of the mortgagor is to be first charged with the payment of the debt. But if A has subsequently conveyed one half of his 100 acres to B, *with warranty,* the 50 acres remaining in the hands of A, is in equity first chargeable with the payment of the balance of the debt which cannot be raised by a sale of the 100 acres which still belong to the mortgagor, or his *subsequent grantee,* before resort can be had to the 50 acres which A has conveyed *with warranty.* And if A conveys his remaining 50 acres to C, *with* or *without* warranty, that portion of the premises is still liable for the mortgage debt, and must be sold before resort can be had to the 50 acres *previously conveyed with warranty to B.*"

It is plain, therefore, that Henry H. Cumming could have gone into equity, as against Mrs. Rowell and subsequent *volunteers* under her ; that her warranty constituted her a *debtor* to him, and that all gratuitous after assignments would be void as against him. And if the court in *Stoney* vs. *Shultz* were right in holding "*that every subsequent purchase operated as a fraud upon the first purchaser, by diminishing the amount of the security,*" how much more true is it in the case of *volunteers* in the face of such a covenant, and with a knowledge of the immense burden impending over the estate ?

There is still another striking aspect in which this transaction may be considered. Suppose Cumming and Ware stood in equality in every other respect, *time only excepted,* would not the maxim, *qui prior est in tempore, potior est in jure,* or where *equities* are *equal,* that which is *prior* in point of time is *strongest,* be decisive of the preference contended for by the plaintiff in error ? Among equitable incumbrances, I take it, the principle *is not* that the *elder* shall serve the *younger,* but the reverse, the *elder* shall have priority over *every junior.*

In all the legal science there is not a maxim more simple, more comprehensive, more frequently referred to by the bench, or cited and relied on by counsel in their arguments, than the foregoing. It is upon this principle, that where several notes secured by the same mortgage are assigned at different times, if the fund arising from the sale of the mortgaged premises is not sufficient to pay all the notes, the assignees will be entitled to priority in payment in the order in which the assignments were made, unless the assignor at the time of the assignment, gave a preference to one or more over the rest. Priority of right of satisfaction, results, say the courts of chancery, as a legal inference from priority of assignment. *In other words, when equities are equal, the oldest will prevail. Cullen* vs. *Erwin,* 4 *Ala. R.* 452 ; *Bank of Mobile* vs. *P. & M. Bank of Mobile,* 9 *id.* 645.

Some writers trace to this *maxim* the right of *primo*-geniture, or the rule of descent which declares that among males of equal degree, the *eldest* shall always inherit in preference to the others. It is usual, I know, to deduce it from the feudal system; it certainly existed in the patriarchal ages.

The doctrine of *occupancy* rests upon no better title ; so likewise the right of property in treasure-trove, in wrecks, waifs and estrays, which being *bona vacantia,* belong to the *first finder.*

The whole doctrine of *possession*—and a *vast* doctrine it is—and all the rights incident to it, and likewise of *pre*-emption, depend upon this important maxim. So, all the preference given to attachments and other process, which is *first* executed; so likewise, the whole subject of pledges and hypothecations. Indeed, it máy be assumed as a general principle, that whenever a question arises as to the title to property, it is a mere comparison of dates, the *eldest* always being *preferred* The only interrogatory propounded is, *when* did your right accrue? or, who is *prior in tempore?*

But this view takes a still wider range. The empire or sovereignty of a large portion of the earth, is based upon this fundamental maxim. "All mankind," says Vattel, "have an equal right to the things which have not yet fallen into the possession of any one; *and these things belong to the first possessor.* When, therefore, a nation finds a country uninhabited and without a master, it may lawfully take possession of it; and after it has sufficiently made known its will in this respect, it cannot be deprived of it by another." *B.* 1, *ch.* 18, *p.* 159. And this is the settled international law of the civilized world.

Why should it be thought a strange thing, then, that the priority in the point of time, in this case, should secure to Cumming a preference so interwoven with the whole dominion which we claim over external things? By no better right do we, and the European nations, possess the lands on the American continent, and exercise control over the Indian tribes, the former proprietors.

Before dismissing this case, I will advert briefly to one other point glanced at in the argument.

[3.] It is suggested, that inasmuch as these instruments settle the whole of this property to the use of Mrs. Grace Rowell during her life, that they do not take effect till her death; and that consequently the title under both conveyances accrued at the same time. I am aware that this suggestion has not been deemed worthy of a place among the points made by the defendants in error. Still it is put forth as one of the grounds in the case, and relied on by counsel in the argument.

Now, if this be correct, these instruments are not *deeds*, but *wills*. What then is their true character? The test for determining in cases of this description, whether an instrument be testamentary or not, is this, *does the legal estate in the property which is the subject of disposition, pass by it?* If the legal estate passes at the time of execution, it cannot be a will.

In *Tompson* vs. *Browne*, 2 *Myl. & Keene R.* 32, the case of the *Attorney General* vs. *Jones*, 3 *Price R.* 368, decided in the Court of Exchequer, was cited. In that case, three judges out of four held, that a settlement, by which the grantor reserved to himself the dividends of certain stock for his life, with limitations to take effect upon his decease, and a power of revocation, was substantially a testamentary paper.

By the Master of the Rolls. " The decision in the *Attorney General* vs. *Jones*, seems to have proceeded upon the ground, that under the circumstances of that case, nothing passed from the maker of the instrument so as to entitle any other person to interfere with his property in his lifetime. If there be any thing in that decision to support the notion, that where a person by deed settles property to his own use during his life, and after his decease for the benefit of other persons, a power of revocation reserved in such a deed alters the character of the instrument, and renders it testamentary, I can only say that, if this were law, a great number of transactions of which the validity has never been doubted, would be liable to be impeached."

Both of the instruments here took effect *eo instanti* upon the [4.] execution, with postponement of possession on the part of the *donees*. They purport to be *deeds*; they use words of conveyance *in presenti*; they are founded upon a *good* consideration; they warrant the title; they are sealed and delivered in the presence of witnesses, one of whom is a notary public, and another a justice of the Inferior court of Richmond county; they convey absolutely to trustees for certain purposes; 1, to the use of the grantor during her life; 2, to the use of her relatives therein named in remainder; they are deeds, then, to all intents and purposes, and the right to the property thereby conveyed, took effect immediately.

In every view, then, which we have been able to take of this case, the judgment below must be reversed. Reason, as well as the main current of legal adjudications, are against it.

Judgment reversed.