DETERMINED IN

# THE SUPREME COURT

OF THE

# TERRITORY OF ARIZONA,

## JANUARY TERM, 1875.

---

RUFUS E. ELDRED, APPELLANT, *v.* SOLOMON WAR-
NER, ADMINISTRATOR OF THE ESTATE OF GEORGE M.
NEWSOME, DECEASED, RESPONDENT.

WHERE TWO PERSONS DOING BUSINESS AS PARTNERS AGREE IN WRITING
that, in case of the death of either of them, the survivor shall settle the
business of the partnership, and after paying the just debts of the part-
nership and of the deceased, shall have all the remaining property of
every kind for his sole use and benefit, without any process of law what-
soever, accounting only to the creditors of the partnership and of the
deceased partner, a complaint filed, after the death of one of the parties,
in the district court by the survivor, setting up the agreement and asking
that the administrator of the deceased party be required to turn over to
him all the property in his possession belonging to the estate of the de-
ceased, and offering, on the part of the plaintiff, to perform all the terms
and conditions of the agreement, is not demurrable on the ground that
it does not state facts sufficient to constitute a cause of action.

APPEAL from a judgment of the district court of the first
judicial district, county of Pima, sustaining the demurrer to
the complaint. The facts are fully stated in the dissenting
opinion delivered by Chief Justice Dunne.

*McCarty, Clark, and C. W. C. Rowell,* for the appellant.

The only and main objection to the complaint in the court below was as to the sufficiency in law of the agreement or compact set forth in the complaint.

It is alleged by the respondent that the said agreement or compact is not an agreement or compact recognized by law, but if it be anything at all under the law, it is a will. In order to show that such compact or agreement is not a will but a contract, let us in the first place consider the contract in question in the light of a contract relating exclusively to realty, that is, as if the subject-matter were real instead of personal property. Let us also present to ourselves at first cases upon which the law is plain and undoubted, and then by illustration and analytical reasoning, and a knowledge of all the facts and circumstances attendant upon the case at issue, endeavor to bring it within the rule.

It is well understood that contracts for the sale of land founded upon a valuable consideration, where no fraud or other destroying agency appears, are always held valid and will be enforced in equity. A valuable consideration may be money, marriage, etc., or it may be an exchange. Now if A., for example, should enter into a written contract with B. to sell to B. a certain piece of land, at a certain given time, upon the payment by B. to him of the sum of one hundred dollars, just as soon as that certain time has arrived, and B. has made said payment or offered so to do, a court of equity would certainly compel A. to execute a deed of the land in question to B.

This must be admitted to be a plain case, upon which the authorities are unanimous. The contract would be what is deemed an executory contract, until the time named in the contract had arrived, when it would immediately by operation of law become converted into an executed contract, and an action thereon for specific performance would lie. Now let us proceed a little further in our course of illustration and reasoning, and by changing to a slight extent the terms of said contract, advance a step toward the conclusion at which we are desirous of arriving. Instead of a certain time named, we will insert the words "when peace shall be declared," making the contract, or in other words its perform-

ance, depend entirely upon a contingency. Here we have a contract whose performance is based upon a contingent event, upon an uncertainty; for peace might never be declared, and the contract remain forever a dead letter. Still it is based upon a valuable consideration, at the same time is perfectly valid, and only awaits the happening of the contingency named to don the robes of an executed contract, upon which an action for specific performance would lie, and which equity is bound to enforce.

Let us go a step further: suppose A., in consideration of one hundred dollars, contracts in writing with B. that upon A.'s death certain land shall belong to and vest in B. Now we are all aware that nothing is more certain than death, but in law it is deemed a contingency, because of the uncertainty of the time of its happening. Now both of the last two contracts are based upon contingencies, upon the happening of which—the " declaration of peace " in the one, and the fact of death in the other—they become executed contracts, and may and must be enforced in equity. A person may dispose of his property in any way or manner he desires; he may, if not laboring under any legal disability, enter into any contract for the disposal of his property, either before or after his death, as he wishes. The law does not and can not restrain him in this particular, unless it be done in subversion or in fraud of the rights of others.

A person desirous of disposing of his property after death may make a will, but most certainly the law does not limit him to that particular form or method of procedure. He has the right to say in what form his property shall be after death, and to whom it shall go. And we claim that if a valuable or legal consideration be apparent upon the face of a contract made and signed by him, he may dispose of such property by such contract as well as by will. If he desires to make a contract with B. that upon the payment of a certain sum, after the death of B., certain property shall belong to him, it is a good and valid contract, and the law will enforce it. In such case it is merely a change in the form of property. His legal representatives will be obliged to conform to the terms of the contract, and especially in case it was further provided that B. should pay the debts of A. over and above the certain consideration named. The rep-

resentatives of A. will not be allowed to object in the case named. They are merely beneficiaries at best; the decedent has chosen to change the nature of his property by contract, and beggars can not be choosers. The above cases are plain and simple, and so tangible in fact that they may be readily grasped by any legal mind. For that purpose we have selected them, and the conclusions we have drawn from them we consider correct and incontrovertible. We desire them viewed stripped of every species of fraud, and the parties to them of every legal disability.

The law is an affectionate guardian, and will always follow the wishes and intentions of the parties with whom it has to deal, unless its rules are openly violated and trampled upon. Now in the examples before cited, real property alone has been the subject-matter of the contract. Would not the same cases apply and the same rules follow if it were personal property? We contend that they would.

The only distinction is the character of the property. Contracts relating to realty may be enforced in equity; so may those relating to personalty, under certain circumstances. Those circumstances in general, and especially those concerning the particular question at issue, will hereafter be considered in detail. But assuming, for the purposes of this argument, that all of the required circumstances were connected with this contract, whose subject-matter is personalty, we are forced to find that the law regarding the right and the remedy is just the same whether the subject-matter be real or personal property. We have seen cases where contracts could be conditional upon death and be performed thereafter.

And here we will remark, that in accordance with the preceding argument it could be no objection to say that because a contract can not be performed by its conditions during the life of a party making such contract, that it can not be performed after death.

All contracts of insurance depend upon a contingency, and that contingency is death. We will review this point more particularly hereafter. If a party may confer a benefit upon his legal representatives, whether it be by will, contract, or otherwise, he may also impose a responsibility to the extent of the value of his property. This responsibility

may be imposed by the decedent, either by an obligation incurred and fixed during his life-time, or by an obligation incurred during his life-time but to take place after death. It is but the following out of his intentions, concerning which the law is so careful, and of which it is such a faithful guardian. Let us advance a step further. Though joint tenancy has been abolished by the statutes of numerous states, still at the same time no one will deny that a contract declaring an ownership in land in the nature of a joint tenancy can be created and enforced in law. For instance, A. and B. are owners of contiguous pieces of land of equal value; thus being, they enter into a mutual written contract, the terms of which are, that upon the death of one the whole of the land shall go to and vest in the survivor. In such case the parties might not be styled in law joint tenants, but their ownership of the land under the contract would be *quasi* joint tenancy, and would be enforced under the law of England and the United States. Here the contract is again executory, the consideration being in the nature of an exchange. It is also a contingent contract, dependent upon the death of one of the parties; but immediately upon the happening of the death it becomes an executed contract in favor of the survivor. Can any one deny the validity of this contract?

It can not be said to be *contra bonos mores*, no more so than that contract whereby a creditor insures the life of his debtor. They are of one and the same nature, so far as public policy and public morals are concerned. Will any one deny but that a contingent cross-remainder created by will may be vested in two persons? Certainly not. Then what are the relative conditions of the two parties enjoying a contingent cross-remainder? Stripped of all verbiage, they are exactly similar to those of A. and B. above named. In the latter case they are created by the act of a third party, whilst in the former they are created by the willing act of the parties themselves. Then most certainly if the conditions of a contingent cross-remainder may be thrust upon parties, they perhaps unwilling, then in all law and reason those same conditions may be created by deed or contract between parties perfectly willing.

We think that we have satisfactorily disposed of all ob-

jections that might arise to such a contract, and proved plainly that it would be considered and held valid in law and equity. Such being the case, if the legal representative of the deceased party should refuse to comply with the terms of the contract, an action for specific performance thereof would lie against it there. Of course a joint tenancy or a contingent cross-remainder in relation to personal property might not have existed under the common law, but we contend that the same general principles of the law govern and determine such matters, whether they relate to real or personal property. Those principles are the foundation upon which all laws concerning contracts are based, and they govern from the foundation to the turret. And if all the acts necessary to be done in relation to contracts of a personal nature are done, the same right and the same remedy are applicable. We have thus far shown that under existing conditions and circumstances the laws which govern specific performance, in cases where realty is involved, apply to cases where personal property alone is the subject of controversy. Let us now consider those conditions and circumstances as far as they apply to the case at issue. Specific performance of contracts relating to personalty is decreed by courts of equity: 1. When there is no speedy or adequate remedy at law; 2. When the party applying can not be compensated by damages; 3. When the value of the property in controversy, in contemplation of the party so applying, is far above the actual price or money worth. We will consider the last reason first.

It is alleged in the bill that the appellant and the said George M. Newsome, deceased, were partners; that a great deal of affection existed between them; that the appellant sets a far higher price upon the diamonds mentioned and described in the bill than their actual value, even if that value could be ascertained.

The degree of affection with which he held the memory of George M. Newsome, or the diamonds in controversy, as mementos of the deceased, is not a subject for inquiry; it is sufficient in this case if it be alleged in the bill. The second ground for equitable interposition upon which we have chosen to stand is that the appellant, if forced to maintain his action at law and await there his remedy, could not

be compensated in damages. It is a well-established prin-
ciple that when a party at law can not obtain a righteous
judgment, or where the subject-matter in controversy is of
such a character that the real and intrinsic value can not be
ascertained, there, in such event, equity reaches forth her
hand and grants relief. It is averred in the bill that the
diamonds in controversy are exceedingly valuable, but that
their value can not be ascertained without the aid of an ex-
perienced lapidary and that such experienced lapidary is not
within the jurisdiction of the court; that if the court should
refuse to interpose, money damages would not compensate
him for his loss.

Equity does, and must to a great extent, adapt herself to
the particular circumstances of every case that comes before
her. The appellant, if he should be compelled to proceed
at law alone for his relief, might probably suffer irreparable
loss, and yet at the same time might be fully and duly com-
pensated. But a court of equity does not act upon conjec-
ture, nor trust to probabilities or possibilities, but acts at
once in such a case as this and thereby prevents any possi-
bility of a loss or injury. The third and last ground upon
which we rely is, that there is no speedy or adequate remedy
at law; the objection to this ground, if any there be, is dis-
posed of in the same manner as the last. For most certainly
if a party can not be compensated by damages, his remedy
can not be adequate. For those reasons, we deem the action
well brought and that specific performance will lie.

Now let us descant more fully upon the consideration of
the agreement in question. In *Beckley* v. *Newland*, a case
cited in 1 Story's Equity, section 343, note, the court decided
that the "reciprocal benefit of the chance" was a sufficient
consideration. If that case be law—and we have discovered
no other yet which overrules it—the question of considera-
tion, as far as it relates to this case, is decided, for this case
presents a stronger front than that in *Beckley* v. *Newland*.
In the latter it rested entirely upon the whim of Turgis.
He might have so disposed of his property by will as to
completely disinherit both of his sisters named in the case.
It all rested in chance.

The case in question presents a far different view. There
is no fraud shown or pleaded, there is no undue influence

manifested by either party to the agreement. The law will presume, and must presume, that they entered upon the compact in question fully cognizant of all matters and property pertaining thereto. That they considered and determined the consideration expressed, fully ample and sufficient. As they were then, so, by the presumption of law, they are to-day. If the consideration was sufficient then, it is sufficient now. The question as to whether they or either of them could have disposed of their property during their life-time by sale or barter, or after death by will, does not arise in this case, for such facts, if they exist at all, are not of record and can not be considered.

George M. Newsome enjoyed the benefit of the agreement during his life-time, and if God in his wisdom had so ordained that the appellant in this case should be the first to die, then in such event he would have reaped the advantages of the compact. He enjoyed the benefit of the chance, and in accordance with the case of *Beckley* v. *Newland*, before cited, such was the consideration. Let us illustrate further: Suppose A. and B. should deposit with a third party the sum of one thousand dollars each, together with a written agreement to the effect that whenever one should die the survivor should be authorized to receive the whole amount deposited, viz., the two thousand dollars. Would not such agreement be binding after the contingency had happened, namely, the death of either of the parties? Most assuredly we contend that it would, and the person surviving would be allowed to receive the money. But let us place it in a stronger light: For instance, the same sum of money should be deposited by A. and B. in the manner above stated, only excepting that the agreement was that upon the death of either of them the whole sum of two thousand dollars should go to the legal representatives of the party first dying. This would certainly be perfect, valid, and legal, for it is upon this principle that are based all the mutual protective associations that to-day are organized and working in the various states of the Union and recognized by law. If the latter illustration be founded on good law—and such fact can not be doubted—then the former one must necessarily be correct. It is in the nature of a *quasi* insurance. Now let us go a step further: If the above illustration be based upon correct

principles of law, then most certainly the one which is about
to be presented must follow in its wake.    Suppose A. and
B., instead of depositing the two thousand dollars before
mentioned, should merely deposit an agreement in writing,
wherein each gave this written promise to pay to the survivor
the sum of one thousand dollars.    Here they do not deposit
money but its representative in paper.    Is not this a valid
contract?    Most certainly you can not discriminate between
the former illustration and this one; the law and the prin-
ciple are just the same in both.    Then if this be law, is not
the agreement in controversy legal?    There is no difference
between the cases.    Here is the agreement, here is the prop-
erty, the representation of money.    You may style it a case
of *quasi* insurance if the term may be allowed, the only differ-
ence being, that the dead pays to the living, instead of the
living to the dead.

It is not necessary that an instrument disposing of prop-
erty after death should be a will, nor is such an instrument
construed as a will, as will be seen by the following cases:
*vide* 2 Story's Eq., sec. 786; *De Beil* v. *Thomson*, 43 Eng. Ch.
468; S. C., 3 Beav. 469.

*J. E. McCaffry*, for the respondent.

The complaint filed herein is in the nature of a bill in
equity for the specific performance, by an administrator, of
the terms of an instrument executed by the deceased in his
life-time, and claimed by plaintiff to be an executory contract
or compact, but showing upon its face that it was intended
for the mutual will of deceased and plaintiff.

The instrument is set forth at length in the transcript.
The appeal is from the order of the district court sustaining
the demurrer to the complaint.

The instrument in question, if valid for any purpose, can
only be considered as a will.    4 Kent's Com. 633; *Schumaker*
v. *Schmidt et al.*, 4 Am. Rep. 135, 137, 139, 140; *Brewer,
Adm'r,* v. *Baxter et al.*, 5 Id. 530, 532; Redfield on the Law
of Wills, c. 2, sec. 2; *Martindale* v. *Warner*, 15 Pa. St. 479,
480.    And it can not in any event be considered as a claim
against the estate.    Probate Laws of Arizona, secs. 128, 130,
131, 133, 139, 140, 145, 147, 150, 220; *Fallon* v. *Butler*, 21
Cal. 31, 32, 33.    If it be a will, it must first be presented to

the probate court of the proper county.  Probate Laws of
Arizona, secs. 3, 4, 12, 13, 294;  *Pond* v. *Pond*, 10 Cal. 500.
As the jurisdiction of the district court is not original, but
appellate.  Comp. Laws, 376, secs. 13, 14.  But the in-
strument can not be considered as a valid will.  Comp. Laws,
250, sec. 5;  *Alter's Appeal*, 5 Am. Rep. 434, 435, 436.

By COURT:

An appeal from a judgment in the first judicial district,
county of Pima, and territory of Arizona, wherein said Rufus
E. Eldred was plaintiff, and the said Solomon Warner, ad-
ministrator of the estate of George M. Newsome, deceased,
was defendant.  The appeal is from the judgment entered
in this cause on the fourteenth day of October, A. D. 1874,
that the demurrer filed in said cause be sustained.  It is
now, on motion of McCarty and Clark for the appellant,
after hearing James E. McCaffry for the respondent, adjudged
that the said judgment be reversed and the cause remanded
to the said district court for further proceedings.

DUNNE, C. J., delivered the following dissenting opinion:

I am unable to concur with my learned associates in the
disposition made of this case.  The record is as follows:
"On the fourteenth of May, 1874, the following bill in
equity was filed in the district court of the first judicial dis-
trict:

"Territory of Arizona, county of Pima.  In district court,
first judicial district.  Rufus E. Eldred, plaintiff, v. Solomon
Warner, administrator of the estate of George M. Newsome,
deceased, defendant.

"Now by attorney comes the above-named plaintiff, and
complaining of the defendant herein, for cause of action
avers and shows, that heretofore, to wit, on the twenty-first
day of February, A. D. 1874, at the village of Tucson, county
of Pima, and territory of Arizona, one George M. Newsome,
then and there being a resident, died intestate and leaving
property and estate within the said county; that thereafter,
on, to wit, the twenty-seventh day of February, A. D. 1874,
the said defendant, as public administrator in and for the
said county of Pima, territory aforesaid, duly petitioned the
probate court in and for the said county of Pima for letters

of administration upon the estate of the said George M. Newsome, deceased; that thereafter, on, to wit, the twenty-fourth day of March, A. D. 1874, the said probate court, by an order duly entered and filed in the said court, granted the petition of the said defendant, and issued to him letters of administration upon the said above-named estate. Plaintiff further avers that thereafter, on, to wit, the twenty-eighth day of March, A. D. 1874, notice to creditors of the said George M. Newsome, deceased, requiring them to present to the said defendant, within ten months from the said last above-named date, with the necessary vouchers, all claims against the said estate, was duly printed and published in a weekly newspaper known and designated as the 'Arizona Citizen,' and published at the village of Tucson, county and territory aforesaid.

"Plaintiff further avers that on, to wit, the eighteenth day of December, A. D. 1873, at the town and county of Yuma, and territory of Arizona, he, the said plaintiff, and the said George M. Newsome, in his life-time, entered into a certain compact and agreement; said compact and agreement being hereto annexed, marked 'Exhibt A,' and made a part of this complaint, wherein the said George M. Newsome of the one part, and the said plaintiff of the other part, covenanted and agreed, one with the other, that upon the decease and death of either of the said parties to the said compact and agreement, then that all goods, chattels, and property, both individual and partnership, of whatever character, of which either of the said parties was seised at the time of his death should fall to and vest exclusively in the survivor, upon the said survivor paying all of the debts of the deceased party.

"The plaintiff further avers that the said George M. Newsome died on or about the twenty-first day of February, A. D. 1874, and that the said plaintiff is now the survivor as mentioned in said compact and agreement, and legally entitled to the possession and ownership of all the property of which the said George M. Newsome died seised. Said property consists of and is described as follows, viz.: two diamond rings, one plain gold ring, one large diamond breastpin, and one pair of diamond sleeve-buttons. Plaintiff avers that the above-described property is of great value; also the interest of the said George M. Newsome in the unsettled

business of the partnership formerly existing between the deceased and the said plaintiff, which is of the value of fifteen hundred dollars; that all of the above mentioned and described property, with the exception of the said partnership interest, above named, is now in the hands of the said defendant as administrator of the estate of the said George M. Newsome, deceased. Plaintiff further avers, that upon the said above last-named day the said defendant, as such administrator, rejected the said compact and agreement by his written indorsement of rejection on the back of the same, as will more fully appear by reference to the 'Exhibit A' hereunto annexed.

"And plaintiff further avers, and shows as a ground for the equitable interposition of this court, that the real and intrinsic value of the said property in question and above described, with the exception of the said partnership interest, is unknown to the said plaintiff, nor can such real and intrinsic value be ascertained except by and through the most experienced lapidaries, and that the said plaintiff is informed and verily believes that there are no such experienced lapidaries within the jurisdiction of this court; that if this court should refuse to equitably interfere between the said plaintiff and the said defendant, the said plaintiff could not be compensated in damages, for the reason such damages could not with any certainty be ascertained.

"And as a further ground for the equitable relief sought for in the complaint, plaintiff avers that the property in question and above described, with the exception of said partnership interest, is to him of a value altogether beyond their price, or actual money worth, a *pretium affectionis* on account of the bonds of friendship which united him to the said George M. Newsome; that if the said property were sold or departed from the possession and ownership of the said plaintiff, money or damages could not compensate him for the loss of said property. Plaintiff further avers that he has at all times been ready and willing, and is now ready and willing, to perform all of the conditions imposed upon him by the terms of the said compact and agreement hereunto annexed, to wit, the payment of all of the debts of said partnership heretofore mentioned, and the individual debts of the said George M. Newsome, and that he has at

divers times notified and informed the said defendant, as administrator of the said estate, of such readiness and willingness on his part to perform the said condition; and now the said plaintiff comes into court and says that he is now ready and willing to perform the said condition in any manner or form as this court shall deem fit and proper in the premises."

The complaint is verified in the usual form.

"EXHIBIT A.

"This agreement, made the eighteenth day of December, A. D. 1873, between George M. Newsome and Rufus E. Eldred (sic), witnesseth: that the parties hereto have been and are now full partners in all their business of whatsoever kind that has been contracted by them or either of them; that it is agreed now that in the case of death of either partner, the surviving partner shall settle the business of the partnership, and that after paying all the just debts of said partnership, and the debts of the deceased partner, that all the property of every kind, money or stocks, remaining, shall belong to the surviving partner, for his sole use and benefit, without any process of law whatsoever, accounting only to the creditors of the firm, and the creditors of the deceased partner, and to no one else without exception.

"This agreement has always been fully understood between the parties hereto, and after careful consideration is now fully understood, and we now bind ourselves, and all persons connected to or with us, firmly by this agreement.

"G. M. NEWSOME.    [Seal.]
"R. E. ELDRED.    [Seal.]

"Signed in presence of
    "H. N. ALEXANDER."

Then next appears the following affidavit:

"Territory of Arizona, county of Pima, ss.

"Rufus E. Eldred (sic), being first duly sworn, deposes and says the within claim is justly due, that no payments have been made thereon, and that there are no offsets to the same to the knowledge of the said affiant, the claimant.

"R. E. ELDRED.

"Subscribed and sworn to," etc.

Then comes the following indorsement of rejection:

"Rufus E. Eldred having submitted to me this article of agreement as a claim against the estate of George M. Newsome, deceased, the same is hereby disallowed this fifth day of May, A. D. 1874.          SOLOMON WARNER,

"Administrator of the estate of George
M. Newsome, deceased."

Then follows a copy of the summons; next, a demurrer that the complaint does not state facts sufficient to constitute a cause of action by McCaffry for defendant. Upon the hearing in the court below, the demurrer was sustained. Plaintiff appealed.

*McCarty and Clark and C. W. C. Rowell,* for plaintiff and appellant, claiming the instrument to be a contract, cited *Logan* v. *Wienhold,* 1 Story's Eq., sec. 786; *Du Beil* v. *Thompson,* 43 Eng. Ch. 468; *Beckley* v. *Newland,* as referred to in 1 Story's Eq. 343.

*McCaffry,* for defendant and respondent. It is not a will. 4 Kent, 633; *Schumaker* v. *Schmidt,* 4 Am. Rep. 135; *Brewer* v. *Baxter,* 5 Id. 530; Redf. on Wills, c. 2, sec. 2; *Martindale* v. *Warner,* 15 Pa. St. 479. It is not a claim against the estate. Prob. Laws, A. T.; *Fallon* v. *Butler,* 21 Cal. 31. Plaintiff should have gone to probate court first. Prob. Laws, A. T.; 10 Cal. 500; Comp. Laws, 376, sec. 13, 14. It is not a valid will. Stat., Wills; Comp. Laws, 250; *Alter's Appeal,* 5 Am. Rep. 434.

On the hearing in this court it was adjudged by the majority of the court that the judgment below, sustaining the demurrer, be reversed. I can not concur, and I submit the following reasons for my dissent. I will first, as a preliminary matter, consider whether the question of jurisdiction has been raised. Section 144 of the New York code prescribes the first and sixth grounds for demurrer as follows:

1. That the court has no jurisdiction of the person of the defendant or of the subject of the action.

6. That the complaint does not state facts sufficient to constitute a cause of action. New York Code, sec. 144.

Section 40 of our civil practice act is the same, and is of course taken subject to such judicial construction as was had in New York prior to our adoption of it; therefore, whatever

objection could have been taken in New.York under a de-
murrer for the sixth cause, at the time our statute was
adopted, must also be allowed here. In New York it was
held under that statute, before our adoption of it, that al-
though the usual form of excepting to the jurisdiction of
the court is by special demurrer under the first head, *never-
theless* this is not necessarily the form for the case of an
objection to what is called the equitable jurisdiction, which
depends on remedy at law. Thus, the objection that the
facts stated in the complaint do not present a proper case
for the exercise of the equitable power of the court to remove
a cloud from plaintiff's title, is not an objection to the ju-
risdiction of the court, which must be taken specifically
under section 144, subdivision 1, of the code, but it may be
taken by demurrer under subdivision 6 of that section, on
the ground that the complaint does not state facts sufficient
to constitute a cause of action. *Hotchkiss* v. *Elting,* 36 Barb.
38, as quoted in 2 Abb. Pr. & Pl., p. 5, note x.

The complaint in this case prayed for equitable relief
alone, and showed that no other relief was possible, and ex-
pressly alleged that there was no adequate remedy at law.
Under that showing in the complaint, the demurrer in this
case raised the question of jurisdiction. *Hotchkiss* v. *Elting,*
36 Barb. 38. Besides this, section 45 of our civil practice
act, following the sections assigning objections which may
be taken by demurrer or answer, says: "If no such objection
be taken either by demurrer or answer, the defendant shall
be deemed to have waived the same, *excepting only* the ob-
jection to the *jurisdiction* of the court and the objection that
the complaint does not state facts sufficient to constitute a
cause of action."

The question of jurisdiction is never waived. It can be
raised at any time. And there is nothing in our statute
limiting a party to any particular way of raising such an
objection, or any particular time when he shall do it. It
would appear, then, that at any time such an objection is
brought to the notice of the court in any way it must be en-
tertained, and if found good, it must be sustained; at least,
I think there can be no doubt that such is the case where
there is an inherent, insuperable, incurable bar to the juris-
diction. I will not say, if there was a potential jurisdiction,

but that, by a technical omission of the service of some notice or something of that sort, it had not been perfected, some formal motion might not be necessary in order to give the party in default a chance to explain or possibly remedy the defect; but where it is found that it is not within the power of the court, by any means known to the law, to acquire jurisdiction, then I do not consider that it is necessary even for counsel in the case to suggest the objection. It would be the duty of the court, I think, on suggestion of an *amicus curiæ*, or of its own motion, to dismiss the case, because if objection of counsel was necessary to raise the point, then jurisdiction could be forced upon the court by consent of counsel or of parties, and this, it is well settled, can not be done—jurisdiction can not be conferred by consent. Therefore I think the doctrine in *Hotchkiss* v. *Elting*, 36 Barb. 38, eminently sound, that a formal demurrer that the complaint does not state sufficient facts to constitute a cause of action very well raises the question whether it is a case of which the court can by any possibility have jurisdiction.

The complaint in this case was a bill in equity for specific performance, but it contains a certain statement of facts. If those facts, as stated, would give the plaintiff a standing in court on any other basis than the one he supposed he occupied, it may be urged that he would have been entitled to the proper relief, although such relief might have been at law instead of in equity. I shall therefore consider this complaint in every way in which it seems possible to me that it might be made the ground for relief of any kind, either at law or in equity. I shall consider whether the demand made can be regarded as upon a claim against the estate in the sense of the probate act, or as upon a contract, and if it seems the instrument has reference to neither of these things, I shall endeavor to see what kind of a document it is, judged by the accepted canons of judicial construction, and if found to be anything at all, whether in such case the court could grant any relief upon it.

1. Is this a claim against the estate in the sense of the probate act? To determine whether the claim made by plaintiff is such a claim as the statute contemplated, we must examine, first, what kind of a claim it is which plaintiff puts forward, and then see whether it falls within the class de-

scribed in the statute.  The plaintiff claims that by virtue
of a certain instrument in writing, which he calls a contract
between him and the deceased, he has practically become
the sole and exclusive devisee of the deceased, with the right
to take the whole estate and administer upon it himself,
paying all just claims against the estate, and retaining the
residue thereof to his own exclusive use and benefit.   The
demand he made upon the administrator was that the whole
estate of the deceased, then in the hands of the administrator,
be delivered to him.   This the administrator refused to do.
Whereupon plaintiff brought this action, praying that the
court order the administrator to comply with his demand.
Such was the claim which the plaintiff presented to the ad-
ministrator.

Now let us see what kind of claims the statute says may
be presented to the administrator, and which, upon his re-
jection thereof, the district court may examine and order to
be paid in due course of administration, and let us consider,
as we go along, whether in these sections the word " claim "
does or does not mean a *money demand* and what a *creditor*
may present.  Section 128 of our probate act says that
" every executor or administrator shall, immediately after
his appointment, cause to be published in some newspaper
published in the county, etc., a notice to the *creditors* of the
deceased, requiring all persons having *claims against the de-
ceased* to exhibit them with the necessary vouchers," etc.

Section 130: "If a claim be not presented within ten
months after the first publication of the notice, it shall be
barred forever, provided, if it be not then *due,* or if it be con-
tingent, it may be presented within ten months after it shall
become due or absolute," etc.

Section 131: " Every claim presented to the executor or
administrator shall be supported by the affidavit of the
claimant that the amount is justly due, that no *payments*
have been made thereon, and that there are no offsets to the
same, to the knowledge of the claimant or other affiant.
The amount of interest shall be computed and included in
the statement of the claim, and the rate of interest deter-
mined," etc.

Section 133: *"Every claim* which has been allowed by the
executor or administrator, and approved by the probate judge,

shall, within thirty days thereafter, be filed in the probate court and be ranked among the *acknowledged debts* of the estate, to be *paid in due course of administration*," etc.

Section 134: "When a claim is rejected, either by the executor or administrator or the probate judge, the holder shall bring suit in the proper court against the executor or administrator, within three months after the date of its rejection if it be then due, or within three months after it becomes due, otherwise the claim shall be forever barred."

Section 140: "The effect of any judgment rendered against any executor or administrator upon any claim for money against the estate of his testator or intestate, shall be only to establish the claim in the same manner as if it had been allowed by the executor or administrator and the probate judge, *and the judgment shall be*, that the executor or administrator *pay in due course of administration the amount* ascertained to be due. A certified transcript of the judgment shall be filed in the probate court. No execution shall issue upon such judgment, nor shall it create any lien upon the property of the estate, or give to the judgment creditor any priority of payment."

Section 147: "At the same term at which he is required to return his inventory, the executor or administrator shall also return a statement of all *claims* against the estate which shall have been presented to him. * * * In all such statements he shall designate the names of the creditors, the nature of each claim, when it became *due* or will become due, and whether it was allowed or rejected by him."

These sections speak of creditors, of amounts being due, payments thereon, offsets to the same, computations of interest, the rate of interest, and the payment of such claims in due course of administration.

To my mind, it seems beyond question, that in all these sections the legislature had in view one class of claims only, namely, money demands—demands of a certain sum of money, or a sum which by examination could be made certain, a claim which would be fully met by a money judgment, or by an order to procure and pay a certain sum of money, and not prayers for equitable relief, demands for specific performance, or claims for an entire estate.

There seems to be no necessity for trying to give the pre-

ceding sections a wider range than was manifestly intended by their wording, namely, to provide for the adjustment of money demands, because the act makes full provision by means of other sections for the adjustment of every other kind of demand which can possibly arise in the settlement of an estate. There is no trouble in discovering what shall be done with different demands under the probate act. In its three hundred and six sections, copied mainly from the California law, and profiting by all the experience had in that and other states, all is provided for in a clear, orderly, and comprehensive manner. Every possible claim or demand or right connected with the settlement of an estate receives full consideration, and its appropriate section or sections prescribe how it shall be presented, and when it shall be determined. Some it sends to the administrator, some to the justices' court, some to the probate court, and some to the district court; each in its separate course, but all in harmony with established principles of jurisprudence. If these sections as to claims against the estate mean other claims than for money demands, then why such care in providing other sections for so many other kinds of demands, on which the proceeding is entirely different from that of going to the administrator with the demand? In the broad, unlimited sense of the word "claim," a person has a claim against the estate when the testator or intestate has wasted, destroyed, taken, or carried away, or converted to his own use, the goods or chattels of such person; so, if he has committed trespass upon the real estate of such person; so, where the deceased was bound by contract in writing to convey real estate to another; so, where he had made any contract with another on which he was liable during his life; so, where a person is entitled to the recovery or possession of real or personal property; yet all these claims are provided for in special sections in a portion of the probate act entirely distinct and apart from the portion concerning what are technically called "claims against the estate" which are to be presented to the administrator, which special sections give a right of action, in the proper court, to a claimant of that class; but all of this would be useless and senseless if the term "claim against the estate to be presented to the administrator" covered all claims, even those other than

A. T. REPS. I—13

money demands. Suppose a man claimed a pair of horses or twenty cows in the possession of the administrator, the administrator can take no action upon such a claim. The power to reject implies the power to judge and allow. When the administrator allows a claim, the effect is merely that it is set down as one of the just debts of the estate, to be paid in due course of administration, and the time for payment can hardly be less than one year, and may be several years; and how can he pay horses, or cows, or diamonds? but the owner is entitled to his horses, or his cows, or his diamonds immediately, if he can show title, and so he is given a right of action for them at once, but that right of action is not as upon a "claim against the estate," in the technical sense of the probate act.

The foregoing sections are substantially a copy of the California probate law. In that state, the question as to what is meant by the word "claim," in sections similar to those above quoted, has frequently arisen.

In *Fallon* v. *Butler*, 21 Cal. 24, the subject received careful consideration; Mr. Justice Field, who delivered the opinion, stating that titles to property amounting in value to millions of dollars hung upon the meaning given to the word "claim" in the probate act. After a full review of sections similar to those above quoted, the judgment of the court was that: "Whatever signification there may be attached to the term 'claim' standing by itself, it is evident that in the probate act it only has reference to such debts or demands against the decedent as might have been enforced against him in his life-time by personal actions for the recovery of money, and upon which only a money judgment could have been rendered."

Under this view of the meaning of the term "claim" in the probate act, the court went so far as to declare in that case, that even a mortgage lien was not a claim against the estate in the sense that it should be presented to the administrator for his action thereon, overruling two former decisions of the court on that point.

The same question has arisen in New York, under a law similar to ours, and thereupon the language of the court was: "The statute contemplates an ordinary debt for which the deceased was liable in his life-time, upon a prom-

ise, express or implied; a debt which may be supported by
the oath of the creditor, which is justly due, which may be
the subject of an offset, and which was cognizable in the
common-law courts." *Sands* v. *Craft*, 10 Abb. Pr. 216; S.
C., 18 How. Pr. 438, as quoted in McClellan's Probate Pr.
234.

But the demand in this case could never have been en-
forced against the deceased in his life-time, and not even
now could a judgment ordering the payment of any certain
sum of money be rendered thereon; wherefore, I consider it
clear that this demand is not a claim against the estate
which should have been presented to the administrator, and
that, therefore, the plaintiff was not benefited in any way
because he did so present the claim, and the case must be
considered as if no such presentation was ever had, except
in so far as the recitals in the complaint as to presentation
show that plaintiff had notice of all the proceedings in the
probate court connected with this estate.

It would have been utterly impossible for the court below
to have proceeded on this demand, as upon a claim against
the estate in the sense of the probate act, because in such
case the judgment is compelled, by section 140 of the probate
law, to take a certain specific form, viz.: "And the judgment
shall be that the executor or administrator pay, in due
course of administration, *the amount ascertained to be due.*"

This matter being on demurrer, the statements in the
complaint are to be taken as true, and the complaint states
it is impossible to ascertain the amount in money which will
be a satisfaction of plaintiff's demand, that money can not
compensate him, that he is praying for certain mementos of
a deceased friend which have for him a *pretium affectionis*
far beyond their money value, even if that value could be
ascertained; so it is clear that no judgment, as upon a
" claim against the estate," could have been rendered in this
case, and therefore, the complaint failed to make a case as
on that ground.

II. Is this instrument a contract on which specific per-
formance will lie? Specific performance will not lie on this
instrument, as a contract, because: 1. As a contract, the
right of action is barred thereon by the probate law; 2. As
a contract, the instrument is a violation of the statute of

wills; 3. As a contract, it is against public policy, and therefore void.

1. As a contract, the right of action on this instrument is barred by the following section of our probate law: "Sec. 195. Actions for the recovery of any property, real or personal, or for the possession thereof, and all actions founded upon contracts, may be maintained by and against executors and administrators *in all cases in which the same might have been maintained by or against their respective testators or intestates.*" Laws, 1873, p. 143.

Could any action have been maintained upon this instrument as upon a contract during the life of the deceased? Clearly not, for by the terms of the instrument itself no right accrued, or could accrue to the plaintiff, until the death of the other party. The legislature has expressly declared that no action can be had upon it *as a contract* after his death.

2. As a contract, the instrument is in violation of the statute of wills. Section 4 of our statute of wills reads as follows: "Sec. 4. Every person of full age and sound mind may, *by his last will and testament* in writing, bequeath and dispose of all his personal estate remaining at his decease, and all his rights thereto and interest therein, and all such estate *not disposed of by the will* 'shall be administered as intestate estate.'" Comp. Laws, 1871, p. 250. There is a similar section as to real estate, and the instrument in this case undertakes to dispose of all property of every kind remaining at the death of either party after payment of debts. Here is a permission to dispose of personal property by will, coupled with the positive declaration that if not disposed of by will it must be administered upon as intestate estate, thus cutting off the right to dispose of it by contract.

Counsel for plaintiff urge in their brief, filed in this case, the following proposition: "A person may dispose of his property in any way or manner he desires. He may, if not laboring under any legal disability, enter into any contract for the disposal of his property, either before or after his death, as he wishes. The law does not and can not restrain him in this particular, unless it be done in subversion or in fraud of the rights of others. A person desirous of dis-

posing of his property after death may make a will, but most certainly the law does not limit him to that particular form or method of procedure." Folio 10 of plaintiff's brief.

I think it is quite clear from the reading of section 4 of our statute of wills, that the law does limit him to the particular form or method of procedure known as making a will, and debars him from disposing of his property by a contract. That our legislature has the power to make such a statute, I will consider in another part of this opinion.

The supreme court of Iowa says: "A contract made in violation of a statute * * * is void, and can not be enforced by action. This principle is sustained by a great number of authorities. Besides those just cited, we refer to a few others: *Pennington* v. *Townsend,* 7 Wend. 276; *Robeson* v. *French,* 12 Met. 25; *Lyon* v. *Strong,* 6 Vt. 219; *Gregg* v. *Wyman,* 4 Cush. 322; *Davis* v. *Bronson,* 6 Iowa, 410; *Wheeler* v. *Russell,* 17 Mass. 258. This last is a leading case upon this subject, in which Parker, C. J., says: 'No principle of law is better settled than that no action will be maintained upon a contract made in violation of the statute.'" *Pike* v. *King,* 16 Iowa, 52. And see *post,* in this opinion, the language of the court in *Habergham* v. *Vincent,* that a man is bound to follow the forms prescribed by law.

3. As a contract, the instrument is in violation of our public policy. It is the policy of our government, as well as of all civilized governments, to foster and uphold the family relation, the basis of all society. The family is fostered and protected by having the right to succeed to the estate of the ancestor. The right of succession is a part of our public policy. The statute of wills, so far as it allows an ancestor to name his heirs to the exclusion of his natural heirs, is in derogation of that right. The privilege which it gives is a privilege to disinherit the heir. It is a privilege very carefully guarded by the checks and limitations in the statute itself, requiring the act to be done in writing, by a person of full age, of sound mind, and in the presence of two witnesses, who shall attest the instrument at the time. The act of disherison in this case is against the public policy of the territory, and would be void independent of the statute of wills, because not sanctioned by any law.

The territory is a possible heir itself to all estates. It

comes next in succession after the failure of all natural heirs, and takes the property of an intestate as an escheated estate. It has a right to say that a stranger in blood shall not succeed to an estate to the exclusion of the natural and legal heirs, except in accordance with express provisions of law. It has named the conditions under which alone he may succeed. There is no provision of law allowing him to succeed under a simple contract, and such a contract is therefore void as against the public policy of this territory. Plaintiff has cited only three authorities in support of his view that the instrument herein is a contract on which a decree for specific performance should be given, viz.: *Logan* v. *Wienhold, Du Biel* v. *Thompson* and *Beckley* v. *Newland,* but neither of them seems to me to have any bearing on the case at bar. *Logan* v. *Wienholt,* 7 Bligh, 53, cited in 1 Story's Eq. Jur., sec. 786, was a covenant by which a person bound himself to give, by his will, as much to A. as he gave to B., and it seems that it was held he was bound to do so. The case is expressly stated by Story to be cited to show how far courts of equity will go to enforce specific performance against parties and *privies* in estate. The case itself is not accessible to me. So many of the English cases of this nature seem to turn on contracts in marriage settlements which are held to pass an absolute present right and to constitute an irrevocable charge on the estate, that the circumstances of the case may be important. B. may have been privy to the contract, consenting to it for a good consideration, but however that may be, it seems that in England that case is not considered as governing a contract like the one at bar, for in the recent case of *Ryan* v. *Daniel,* hereinafter cited, specific performance upon an instrument similar to this was refused.

*Du Biel* v. *Thompson* was as follows: It is an English case. Mr. Thompson was a person possessed of considerable wealth, and had a marriageable daughter. Du Biel was a single gentleman, having the title of baron. Mr. Thompson entered into written agreement with the baron that if the latter would marry his daughter, thus making her a baroness, he would pay down the sum of £10,000 sterling, and would also leave a further sum of £10,000 in his will to be settled on his daughter and her children. The baron, in addition

to marrying the young lady, was also bound to settle £500 a year upon her during her life. The baron performed his part of the agreement. He took Miss Thompson to wife, and settled £500 a year on her for life, secured out of his Mecklenburg estate. Mr. Thompson performed a part of his agreement. He paid down the £10,000, but he omitted to charge his estate in his will with the other £10,000, as he bound himself to do. Du Biel, the plaintiff, son of the baron, his father and mother being dead, filed a bill praying that the executor of Mr. Thompson's estate should be compelled to pay the remaining £10,000, according to the agreement, and it was so ordered, and that is all there is in the case. I fail to see any material analogy between that case and the one at bar. *Beckley* v. *Newland*, 2 P. Wms. 182, cited in Story's Eq. Jur., the only other authority adduced by plaintiff, is also irrelevant. Fry on Specific Performances, page 496, gives the gist of this case as follows: "In *Beckley* v. *Newland*, the plaintiff and defendant had married two sisters who were the presumptive heiresses of Mr. Furgis, a very rich man, who had made and revoked several wills, and ultimately made one leaving a great estate to defendant, and only a small one to the plaintiff. Previously to the execution of the will, the plaintiff and the defendant had entered into an agreement for the equal division between them of what should be left to each of them, and this agreement was upheld and specifically enforced by Lord Macclesfield, who said that the agreement was 'not disappointing the intent of the testator, for he did not design to put it out of the devisee's power to dispose of the estate after it should come to him; but on the contrary, when the testator gave to either of them, he by implication gave to that person a power to dispose of the said estate when it should come to him.'" *Beckley* v. *Newland* was then a contract between two persons to share equally an estate if it came to them, or either of them. The contract in that case was one which could be, and was, enforced during the life of the parties making it, and, it might be argued, would not be obnoxious to the section of our probate act before cited, which bars all actions on contracts against an executor or administrator except such as could have been enforced against the deceased during his life-time,

although even then, if the plaintiff waited until the decease of the other party, he might be met by the case of *Morse* v. *Faulkner*, 3 Sess. Cas. 433, note, to the effect that a liability on such a contract is purely personal, and dies with the person. See Fry on Spec. Perf. 499, 2d Am. ed. But such a contract has been held illegal in this country, even during the life-time of both parties.

In *Mercier* v. *Mercier*, 50 Ga. 546, "plaintiff agreed with defendant, her brother, who proposed to contract a marriage of which their father disapproved, threatening if it was contracted to leave all his property to plaintiff, that she would divide the property if left to her, equally with defendant, who agreed to do the same if the property should be left to him. Defendant was married accordingly, and his father afterwards died and left *him* all his property. Held, that the agreement between plaintiff and defendant was against public policy, and that a bill would not lie for specific performance of it," as quoted in Am. Law Rev., Oct. 1875, p. 137.

I do not consider either of these cases in point. I have cited *Mercier* v. *Mercier*, merely to place it side by side with *Beckley* v. *Newland*. I will now cite a case, the analogy of which to the one at bar will, I think, be evident. I refer to the recent case of *Ryan* v. *Daniel*, 1 You. & Coll. 60. Fry, in his Specific Performance, states the case of *Ryan* v. *Daniel* as follows: "In the latter case, each of two young officers in the army signed and gave to the other a document by which each charged his estate with £1,000 in favor of the other, in case the other should survive him, the consideration of each of these documents being *the other* of them. Many years subsequently a correspondence passed between these officers with a view to a rescission of the transaction, but that intention was never carried into effect. The court held, that, looking at the circumstances of the transaction, the age and condition of the parties, and their subsequent correspondence, there was no equitable claim which the court could enforce; but it retained the bill for twelve months, with liberty to bring an action to establish, if they could, a legal debt." Fry on Spec. Perf. 499, 2d Am. ed. In this last case the claim was for a certain fixed sum of money, which possibly might have been established as a money demand against the

estate to be paid in due course of administration, and the
court, while denying the plaintiff equitable relief on the con-
tract, held the case open for a year to give him a chance to
establish it as a legal debt, or what we would call a "claim,"
or money demand against the estate, so that if he did
succeed in establishing it, the court might make the requi-
site order—I suppose in case the executor refused to pay it.
Our system, as I have shown, is different.  A claim in that
sense does not, with us, come into the equity court at all,
and this action is based on the assumption that the demand
herein is not a claim of that kind.

The probate law and statute of wills of this territory are
public acts, of which, together with the public policy of the
country, courts must take judicial notice.  The instrument
set forth as the whole foundation of the action being void
on its face as a contract, I think it appeared on the face of
the complaint that there were not sufficient facts stated to
constitute a cause of action, as upon a "claim" or as upon
a contract.  It remains to be seen whether there was any
force in the instrument viewed in any other light upon which
the court might have acted, and this brings me to the con-
sideration of the question, What kind of an instrument is
this which was executed by plaintiff and deceased?

In law, instruments are classed according to their legal
effect, notwithstanding the parties may have considered they
had a different effect, or may have given them a different
name at the time of their execution.  Parties may sign an
instrument and call it a deed, but the courts will sometimes
tell them that it is in fact a bond, or a mortgage, or a con-
tract; or probably, to their surprise, they may be informed
that it is not a deed at all, but a will.

The courts have certain legal tests for determining the
character of instruments submitted to them.  The test to
discover whether a document is a will or not, is to inquire
whether it passes a present interest, or whether it passes no
interest until after the death of the maker.  In the first case,
it is not a will; in the second case, it is a will, no matter what
may be its form.  Let us look at some English authorities
on the point.  *Habergham* v. *Vincent,* 2 Ves. jun. 205; S. C.,
4 Bro. C. C. 353, was argued before the high court of chan-
cery in England in 1793, Lord Loughborough, chancellor.

In this case, a person made a will disposing of all his estate, prescribing the line of succession through a great number of possible contingencies. At a certain point in these limitations he stopped, weary, possibly, with following the line of possible succession, and declared that he reserved to himself the right to dispose by deed of the way his estate should go if the last contemplated contingency should fail. The next day, fresh for the work, he took up the tangled thread of remainders and by a *deed-poll* directed how the estate should go in the event of the failure of the last contingency provided for in the will; and soon after he died. Then, in a surprisingly short space of time, every one of the dispositions in the will failed by the death of all the heirs under the will. Then the latent power of this *deed-poll* came into play, and the question was, Should it operate as a deed or as a will? If it fully operated as a will, it would disinherit the heir at law and pass the estate to a stranger in blood. The case was argued first before Lord Thurlow, and he, the report says, "having taken a long time to consider," sent it to the king's bench in 1792. In consequence of too brief a statement of the case as sent, the court of king's bench held the deed-poll to be a deed, and incompetent to vest any estate in the parties claiming under it. The case was reargued in the high court of chancery before Lord Loughborough, and he declared that he thought the deed-poll was in fact a testamentary document, but having been decided differently in the king's bench, he did not like to decree it alone, therefore, would give another hearing, and call in two judges from that bench, that they might enlighten him in the matter. He called Justices Buller and Wilson. The case was then reargued before the lord chancellor and those two judges, three counsel being heard on each side, one of whom was the attorney general. The lord chancellor complimented the counsel on their efforts, declaring that the question had been argued with "great industry and ability." I mention all this to show what thorough consideration was given to the question as to how a document may be testamentary in its nature, though it be not in the form of a will, nor intended as a will, but really intended as a deed.

It was on this final hearing in the high court of chancery unanimously decided that the instrument was not a deed,

but a will; that it would not pass any of the freehold estates, because for that purpose it was defective as a will, it not having sufficient witnesses, but that it was sufficiently attested to pass the *copy-hold* estate of the testator, one witness being sufficient for that purpose; that therefore the freehold estate should go to the heir at law of the testator, as not having been otherwise devised, but that the copy-hold should go to the heir of the surviving trustee.

Mr. Justice Buller, in delivering his opinion, said: " The first point I shall consider, is whether the last instrument is testamentary or not.  * * *  It was argued for plaintiff that the testator did not intend to make a will when he executed the deed, and therefore it can not operate as a will. Whether the testator would have called this a will or a deed is one question; whether it shall operate in law as a deed or a will is a distinct question, and that is now to be considered. That is to be governed by the provisions in the instrument. A deed must take effect upon its execution, or not at all. It is not necessary to convey an immediate interest, in possession, but it must take effect as passing that interest executed; but a will is quite the reverse.  It can only operate after death, and upon this instrument it is clear the testator had no idea that this paper would have any effect until a distant period long after his death.  * * *  When this case was argued there [in the king's bench], no one of the cases quoted here by the *attorney general* was mentioned or alluded to.  I freely confess they did not occur to me.  But those cases have established that an instrument in any form, whether a deed-poll or an indenture, if the obvious purpose is not to take effect till after the death of the person making it, shall operate as a will.  The cases for that are both in law and equity, and in one of them there were express words of immediate grant and a consideration to support it as a grant; but as, upon the whole, the intention was that it should have a future operation after death, it was considered as a will.  Therefore, this last instrument must be considered as a codicil, and I shall call it so in what I shall say upon it.  The next question is what effect this codicil has upon the freehold.  Upon that point I agree with my brother Wilson, that it is void for want of three witnesses

[but as to the copy-holds, Buller, J., says, "the others concurring that one witness, was sufficient"].

"The lord chancellor, in giving his opinion, concurred in the view that the deed-poll was in law a testamentary document, and said: 'Thirdly, there is no difference between law and equity in determining upon the effect of a testamentary act, and this instrument can not pass the freehold estate contrary to the provisions of a public law making that act void [that is, the law for wills requiring three witnesses for such a will]. The observation made by Justice Wilson is unanswerable, that it is not a personal privilege; that no man can reserve a power to act against the forms the law has imposed. Therefore, if it is to pass by a testamentary act, that must have all the requisite solemnities the law has directed.' * * *

"Mr. Justice Wilson declared: 'By the common law a man could not devise land. Then came the statute permitting him to do so by an instrument properly signed. Then, lest testators should be imposed upon, these guards were created by the statute of frauds, and that insists that a will of land shall either be executed in the manner pointed out, or be void [in this territory wills as to realty and personalty are on the same footing]. This does not leave it at the option of the testator, but is a positive provision that a will shall be void if not executed according to that statute, and the testator can not say he will make a will without the requisites prescribed, either not thinking he will be imposed upon or not caring about it. The law will not suffer that, but requires, in all cases, that these ceremonies, which might be considered as circumstances only if the act had not said otherwise, shall be essential, and be observed in making every will.'" *Habergham* v. *Vincent*, 2 Ves. jun. 205; S. C., 4 Bro. C. C. 353.

I have quoted language from the above case on points other than construction of instruments, namely, as to the binding force of the statute of wills, as cutting off equitable relief in cases not within the statute, to which I will refer in a subsequent portion of this opinion.

To continue with the English authorities. Jarman states: "The law has not made it requisite to the validity of a will that it should assume any particular form, or be couched

in language technically appropriate to its testamentary char-
acter. It is sufficient that the instrument, however irregu-
lar in form or inartificial in expression, disclose the intention
of the maker respecting the posthumous destination of his
property, and if this appears to be the nature of its con-
tents, any contrary title or designation which he may have
given to it will be disregarded. Thus a deed-poll, or even
an *agreement* or other instrument between parties, has *re-
peatedly* been held to have a testamentary operation. * * *
The ecclesiastical judges (before whom, of course, questions
of this kind are most frequently agitated) act fully up to the
principle which regards as testamentary *any instrument*
that is designed *not to take effect until the maker's decease,*
though assuming the form of a disposition *inter vivos,* and
more especially if it be incapable of operation in the in-
tended form, and accordingly, in *repeated instances,* the pre-
rogative court has granted probate of such irregular docu-
ments as the assignment of a bond by indorsement, receipts
for stock, and bills indorsed, a letter, marriage articles, and
promissory notes and notes payable by executors, in order
to avoid the legacy duty." 1 Jarm. on Wills, 13–20
(my italics); also *unsigned* drafts of bonds, Id. 20; also a *deed*
conveying real estate, which contained a clause that *on the
death* of the survivor of two *cestuis que trust,* trustees
should "pay over all the property to different persons," Id.
20; and many other cases similar in principle there cited.
Of course, our statute of wills would prevent probate here of
such instruments; that is, it would determine that as wills,
or testamentary documents, they would be bad, not that
they would be good for some other purpose. To make them
available for other purposes, it would be necessary to show
that they were not testamentary in their nature, for it does
not follow that any given instrument must be of some force
for some purpose; it may easily be of no force for any pur-
pose.

Dufour v. Pereira, 1 Dick. 419, cited in *Lord Walpole* v.
*Lord Orford,* 3 Ves. 416, was a case where two persons
signed an agreement before a notary public, providing for
the disposition of their property after the death of either,
and also after the death of the survivor. The parties were
man and wife, but they were foreigners, and in their own

country some of the property was the separate property of the wife, but the property consisting of personalty, and being in their possession in England, was, by law there, the property of the husband. To save their rights, they signed an agreement declaring with great minuteness what should be done after the death of either and of both. The husband died first, but the instrument was not treated, as to him, as a contract. It was probated as his will. By the terms of the instrument, the wife was to have the enjoyment during life, and limited to that, of all the specific interests. She had a limited power of disposing of part of that property, but all she had was upon condition that she should dispose of it together with such other property as she might acquire after death upon the "*dispositions of that will.*" Such is the language of the opinion. By "disposition of that will" is evidently meant the terms of the agreement, which agreement was held to be the *will* of the party who first died. The wife on her death undertook to dispose of the property received by her under this will, and other property she had afterwards acquired, in a manner different from the terms imposed by the agreement or will; and then came a bill for specific performance, and Lord Camden held that by signing that instrument and taking the benefit of it, she had entered into an agreement to take the property devised to her, subject to the conditions of the instrument under which she took, one of which was that if she took that property she should stand by her agreement that on the death it should go as directed in the agreement, together with whatever property she might acquire after her husband's death. That, I take it, is the extent to which the instrument in *Dufour* v. *Pereira* was held to be a contract. It was construed to be the will of the party dying first, but the terms of it binding as a contract upon the survivor who had chosen to accept its conditions. In the case at bar, the survivor is named as legatee, conditioned, however, that he will pay the debts of the estate. He may rightfully claim these diamonds, which he alleges are of such great value, and which he declares have a *pretium affectionis* for him which can not be estimated in money, if he can get the instrument probated as a will, and will comply with the conditions. The instrument is a contract, as to this plaintiff, to

this extent, that he has agreed that he shall have no right to the diamonds unless he pays all the debts of the deceased.

In the case of *Lord Walpole* v. *Lord Orford,* 3 Ves. 402, from which the above is cited, an attempt was made to prove an agreement for a mutual will. The agreement was not proved, but the chancellor declared, that even if it were proved, unless it were shown to be revocable it would not be enforced. It follows from that, that if an instrument setting forth such an agreement be not revocable, it can not be enforced. If it be revocable, then, being a direction for the disposition of property after death, not to take effect until after death, it is ambulatory in its nature, and is a testamentary document.

Let us now look at the American authorities. "A will may be defined to be a legal revocable disposition of one's property, to take effect from his death." *Langdon* v. *Astor,* 16 N. Y. 9, 49, as quoted in O'Hara on Construction of Wills, 4. "Such an instrument may be couched in any form or language, provided that its whole operation is postponed to the death of the grantor. In one case there were both a consideration for the grant and words of immediate transfer, yet the instrument was held to be testamentary." *Allison's Ex'rs* v. *Allison,* 4 Hawks, 141, cited by O'Hara, p. 4. "In the United States, as well as in England, the testamentary character of a document depends on its substance, and not on its form, except so far as that depends on the statute." Id., referring to *Carle* v. *Underhill,* 3 Bradf. 101, and *In the Matter of Easton's Will,* 6 Paige, 186. "A last will and testament may be defined as the disposition of one's property, to take effect after death." 1 Redf. on Wills, c. 2, sec. 1; *Turner* v. *Scott,* 51 Pa. St. 126; *Frederick's Appeal,* 52 Id. 338.

When the payee of a promissory note made special indorsement to the effect that if he were not living at the time of its payment he ordered the contents paid to a person named, and died before the note was paid, the indorsement was held to be of a testamentary character, and entitled to probate as a will. 1 Redf. on Wills, 169, referring to *Hunt* v. *Hunt,* 4 N. H. 434; S. C., 17 Am. Dec. 438. "A deed which in terms was not to operate until after the decease of the grantor has been held testamentary, and as such

admitted to probate." Id., referring to *Gage* v. *Gage*, 12 N. H. 371; *Ingram* v. *Porter*, 4 McCord, 198; *Milledge* v. *Lamar*, 4 Desau. 617. "Although an instrument is in form a deed, if it appears on its face that it was only intended to have effect after the death of the maker, it will be regarded as testamentary." *Sartor* v. *Sartor*, 39 Miss. 760, as cited in 1 *Redf. on Wills*, 174, note 27. "We are not aware that any essential difference exists in regard to the construction of wills between courts of law and courts of equity." 1 Redf. on Wills, 500.

The question as to whether an instrument in the form of an agreement was testamentary in its nature or not, was considered in the supreme court of Iowa, and it was held that the instrument was testamentary. The opinion states that the rule of construction by which to determine whether the instrument is a will or a contract is: "If the instrument passes a *present interest*, although the right to its possession or enjoyment may not accrue until some future time, it is a *deed* or a *contract*, but if the instrument does not pass an interest or right till the *death of the maker*, it is a *will* or testamentary paper." (The italics are as in the opinion.) *Burlington University* v. *Barrett*, 22 Iowa, 60. Certainly the deceased in the case at bar did not intend to pass any interest in his property until after his death, for he did not covenant to stand seised of any property at all, but simply declared that whatever he might have at his death should go to the plaintiff.

In construing instruments, courts look at the intention of the maker, but in the matter of disposing of property the intention which they inquire into is, not what kind of an instrument he intended to execute, but what kind of an estate he intended to create. The subject-matter in the mind of the maker is, not what the instrument may be called in law, but what he is doing with the property. A man may very well know whether, in giving away a portion or the whole of his property, he wants to give it out and out, at the time, or whether he intends the gift shall not take effect until after his death, though he may not know or care what legal terms courts would use to designate the instrument he executes. The intention as to the property is the vital thing, and that is the intention the courts try to get at; for an instrument

is not the will of the maker unless it is correctly interpreted. His real will is not the paper itself, nor the writing which is upon it.    The writing is merely intended as the expression of his will, intention, or desire.    It may not correctly express that desire or thought; in fact, correctly expressing it, if properly understood, the language may be misunderstood and then his real will is not executed at all.    Therefore, the question the courts try to solve is, What did the maker really wish to do with his property?    This distinction was clear in the mind of the supreme court of Georgia when it declared: "In determining whether an instrument be a deed or a will, the court will not consider what the maker believed it to be, but what in point of law it is.    The intention of the maker as to the *character of the estate conveyed* is the criterion by which the court will determine whether a given paper is a deed or a will, and if the intention gathered from the whole paper is that the estate is not to pass *until his death,* it is a will and not a deed."    *Brewer* v. *Baxter,* 41 Ga. 212; referring also to *Hester* v. *Young,* 2 Id. 31.

I think I have cited enough to show that under both the English and American authorities any instrument, no matter what may be its form, which undertakes to dispose of property, the disposition not to take effect till after the death of the maker, no interest of any kind passing until after his death, is a testamentary document, to be treated entirely as such, so far as it relates to such property; and that the rules for constructing such an instrument are the same in equity as in law: that the character of the instrument once established as a will, it must then be treated throughout, so far as it relates to such property, as a will, to have force as a will so far as the disposition of that property is concerned, or else have no force at all in that respect.

In *Burlington University* v. *Barrett,* 22 Iowa, 72, the court said that counsel contending that the instrument was a contract cited twelve cases in support of that proposition.    None of these cases cited are accessible to me; but I find in looking at the brief of counsel citing them, that five of them are cited in support of the proposition that "an instrument conveying personal property absolutely but retaining possession and control thereof during the life of the grantor is valid."    In reply to those cases, it may be answered: 1. That

the instrument i            ᴧse does not pretend to convey any
personal propert            ᴊly; 2. That even if it did, such
mode of disposin            onal property after death is forbid-
den in this territc ᴌᴊ ᴏy statute, which declares it can be done
only by will, executed with the same formalities as a will for
realty.  Of the remaining seven cases, three of them are
cited in support of the proposition that "an obligation to
be performed or to pay money after the death of the obligor
is a-valid contract, and not a testamentary writing."

In the instrument at bar, there is no obligation to pay
money after death, and if it be claimed that it imposes an
obligation to be performed after death, and is thereby a
contract in the sense of those cases, it may be answered,
that if the obligation was not to be performed until after
death, no action could have been had on such a contract
during the life of the party; and however it may be elsewhere,
in this territory the legislature has declared that no action
can be maintained against an executor or administrator on
such a contract, as a contract.  The policy and letter of our
law practically make all contracts of that nature void as
contracts, by taking away all right of action on them as con-
tracts.

The wisdom of the law is evident.  When the man is dead,
the fight for the estate begins.  Secret contracts are easily
fabricated.  The man is dead and can not contradict or ex-
plain them.  The estate may be plundered to the prejudice
of lawful heirs; therefore, to protect the heirs the law de-
lares that there shall be no incumbrance on the estate except
such as might have been enforced during the life of the tes-
tator, or such as he imposed upon it by will in the presence
of witnesses as prescribed by law.  But whether wise or not,
such is our law, and we are bound by it.

Of the remaining four cases so cited, they are, in support
of the following propositions, respectively:

1. An agreement to devise land in consideration of the
payment of an annual sum vests an equitable title in the
obligee.  *Johnson* v. *McCue*, 34 Pa. St. 180.

2. A deed referring to and incorporating a will is good,
and, taking the two papers together, shall be considered a
deed, even if the disposition of the property is to take effect
in the future.  *Dawson* v. *Dawson*, Rice's Eq. 260.

3. Where a deed conveys lands for such uses as are not set out in a will already made, neither deed nor will is revocable, if no power of revocation is in the deed. *Mayor etc. of Baltimore* v. *Williams*, 6 Md. 262.

I do not think there is anything in these three cases to break the force of the long line of authorities cited to show what constitutes a will. And such was the opinion of the supreme court where those cases were cited, for the instrument in question there was held to be a will, although in the form of an obligation to pay a certain sum of money after death.

The last of the twelve cases cited to establish the instrument in the Iowa case as a contract is directly in harmony with those I have cited as establishing the instrument here as a will. It is cited as follows: "A test for determining whether an instrument is a deed or a will is, if the instrument was effective and operative at its execution, it is a deed. If it was only to be effective and operative in *the future*, it is a will." *Cummings* v. *Cummings*, 3 Ga. 479.

Judge Saffold, who delivered the able opinion in *Schumaker* v. *Schmidt*, 44 Ala. 454; S. C., 4 Am. Rep. 135, says that in *Golding* v. *Golding*, 24 Ala. 122, "an instrument conveying a posthumous interest was regarded a deed, because it could not operate as a will for want of the requisite number of witnesses." *Golding* v. *Golding* is not accessible to me, but if the court really did adopt that rule for determining whether an instrument was a deed or a will, I can only state that I consider in so doing it not only departed from the established authorities, but broke new and dangerous ground. I understand the character of the instrument is determined by the character of the estate conveyed, and not by the argument *ab inconvenienti*. By the rule in *Golding* v. *Golding*, as stated, every defective will would, if possible, be enforced in some other form, often to the exclusion of a prior perfect will, and the door would thus be opened to endless fraud, for if the requisite number of witnesses to a will may be dispensed with, all witnesses may be omitted, and the forger require no confederate in wresting any estate from the lawful heirs. The statute of wills would become a nullity, and no estate would be safe. *Golding* v. *Golding* is in direct conflict with *Habergham* v. *Vincent*, herein cited,

where the instrument was executed for a deed, could not fully operate as a will for want of the requisite number of witnesses, and yet was still held a will and not a deed.

In the case at bar, the instrument could not be effective to pass any interest to either party until the death of the other. All of the property prayed for by this bill was the individual property of the deceased, outside of the partnership funds, consisting of jewelry and diamonds, which he might at any time have disposed of as he saw fit. It was only in the event of his death with that property in his possession and ownership that plaintiff could acquire any interest in it. Therefore, it seems clear to me that if plaintiff has any claim at all on this estate, it is a claim as heir under a testamentary document, and not as a creditor of the deceased, nor as one taken under a contract. The instrument at bar is therefore a will.

This brings me to the question, Can our district courts establish a will? The instrument in this case is in law a will, but it has not yet been probated so as to have legal force as a will; could the district court have proceeded to hear proof of the execution of this instrument and establish it as the will of deceased? or could it grant any relief to the plaintiff on his bill until the legal proof of the character of this instrument had been regularly made? or could it even then give relief on original bill?

Plaintiff did not pray for the allowance of a money demand against the estate. He expressly declared that no money judgment was possible. He prayed for the estate itself, alleging that he was the person properly entitled to receive it, and asked for an order removing the whole estate from the control of the administrator and placing it in his own hands for settlement. He asked the court below to set aside all proceedings had in the probate court, and to take upon itself the task of ordering the administration and settlement of the estate. He assigns no reason why he did not seek relief in the probate court first. He did not allege any irregularity or fraud in the proceeding of the probate court connected with this estate, and did not show that he could not at the time of commencing his action in the district court have obtained relief even then in the probate court, but on the contrary, as will be seen hereafter, he showed that the

probate court at that time still had jurisdiction of this estate, and that his demand could have been heard and determined there; nevertheless, he presented the demand in the first instance to the district court, the presentation he made to the administrator being no presentation at all.

Under our system, have our district courts the power, even as courts of equity, to take original jurisdiction of such a demand? To answer this question, we must inquire a little into the constitution of our judicial system. If we go back to the source of our judicial power, and note how this power has been ordered, arranged, and distributed, then if there has been any express disposition made of the particular power required in this case, we can easily find where it has been lodged.

The act creating the territory, in force long before the execution of the instrument which is the foundation of this action, and ever since and now in force, declares as follows: "The judicial power of said territory shall be vested in a supreme court, district court, probate court, and in justices of the peace." Section 10, organic act of New Mexico, made applicable to Arizona February 24, 1863. By the same act the following decree was made concerning the jurisdiction of said courts: "The jurisdiction of the several courts herein provided for, both appellate and original, and that of probate courts and of justices of the peace, shall be as limited by law." Id. By the same act the power to limit this jurisdiction was given to the legislature of Arizona in these words: "The legislative power [of Arizona] shall extend to all rightful subjects of legislation, consistent with the constitution of the United States," etc. Id., sec. 7.

The supreme court of the United States has passed upon this question as to what this grant of power means, and has defined it in the following language: "Whenever congress has proceeded to organize a government for any of the territories, it has merely instituted a general system of courts therefor, and has committed to the territorial assembly full power, subject to a few specified or implied conditions, of supplying all details of legislation necessary to put the system in operation, even to the defining of the jurisdiction of the several courts—as a general thing subject to the general scheme of local government chalked out by the organic act,

and such special provisions as are contained therein. The local legislature has been intrusted with the enactment of the entire system of municipal law, subject also, however, to the right of congress to revise, alter, and revoke, at its discretion. The powers thus exercised by the territorial legislatures are nearly as extensive as those exercised by any state legislature, and the jurisdiction of the territorial courts is collectively co-extensive with and correspondent to that of the state courts, a very different jurisdiction from that exercised by the circuit and district courts of the United States—in fine, the territorial, like the state, courts are invested with plenary municipal jurisdiction." *Hornbuckle* v. *Toombs*, 18 Wall. 655.

This disposes of the claim made by plaintiff that the legislature has no power to say that a man may not dispose of his property after death by compact or contract instead of by will, if he desires to do so. The legislature has *full power* over all *rightful* subjects of legislation, and the matter of the disposition of estates is generally admitted to be a rightful subject of legislation. Some deny it, I know. There is a school of sociologists which claims that no man by any human law can rightfully have any exclusive control of any property either before or after death, but the *dicta* of these philosophers are not authority in this court. Our political and judicial systems recognize that these matters are proper and rightful subjects of legislation, and our legislature has full power in the premises.

In the exercise of this power, the legislature enacted an elaborate probate law of three hundred and six sections, and gave to the probate court exclusive original jurisdiction of the settlement of the estates of deceased persons. Laws, 1873, p. 100.

It also enacted a law concerning "wills," and gave like jurisdiction thereof to the probate court. Comp. Laws, 1871, p. 250. The following is one of the sections thereof: "Sec. 5. No will made within this territory, except such nuncupative wills as are mentioned in the following section, shall be effectual to pass any estate, whether real or personal, nor to charge or in any way affect the same, unless it be in writing and signed by the testator, or by some person in his presence, and by his express direction, and attested and sub-

scribed in the presence of the testator by two or more com-
petent witnesses," etc.   (The remainder of the section says,
merely, that if the witnesses are competent at the time,
subsequent incompetency is immaterial.)

Here is another section of the same law: "Sec. 13. No
will shall be effectual to pass either real or personal estate
unless it shall have been duly proved and allowed in the
probate court as provided by law, or on appeal in the dis-
trict court, or supreme court; and the probate of a will of
real or personal estate as above mentioned shall be conclu-
sive as to its due execution." It will be noticed by referring
to the instrument that it was made in this territory; and
section 5 of our statute of wills not only says that the in-
strument at bar, having only one witness, shall, as a will, not
only not *pass* any estate, but shall not *charge* or· in *any way
affect the same*.   This certainly cuts off even all equitable
relief under such an instrument, or any testamentary docu-
ment not fully up in all respects to the express requirements
of section 5.

By another act the legislature created the office of public
administrator, and made it his duty to administer upon all
intestate estates, under the direction of the probate court.
The district court has no right to direct him in his duty
except on appeal.   Comp. Laws, 566.

Section 294 of the probate act provides that the mode of
reviewing the action of the probate court shall be by appeal
to the district court.  Laws, 1873, p. 162.   This appeal is
not taken by filing original bill in the district court, but must
be on notice in the probate court; and the proceedings as
to the notice, bond, transcript, etc., are the same as on ap-
peal from the district court to the supreme court.   Prob.
Act, secs. 293–299.

Section 60 of the probate act provides that notice shall
be publicly given of all applications for letters of adminis-
tration and of the time of hearing.   Section 61 provides
that any person interested may contest the application, as-
sert his rights, etc.   Section 62 provides that on hearing
the court shall make such order concerning the issuance of
letters as the case may require, and in the section concern-
ing appeals special mention is made, that an appeal to the
district court may be had from such an order of the probate

court. There is still another way of removing an adminis-
tor, and this one was open to the plaintiff at the time he
filed his bill below.

Section 98 of our probate law reads as follows: "Sec. 98.
If after granting letters of administration on the grounds
of intestacy a will of the deceased shall be duly proved
and allowed by the court, the letters of administration shall
be revoked, and the power of the administrator shall cease,
and he shall render an account of his administration within
such time as the court shall direct." Laws, 1873, p. 117.
The right to take the property from an administrator once
appointed is thus expressly reserved to the probate court.
The administrator may answer to the demand made by
plaintiff in this case: I know nothing of orders direct
from the district court. I gave a bond to answer for this
estate to the *probate* court. The law requires me to act
under the direction of the *probate* court. I have no settle-
ment with the district court. I must report to the probate
court and settle there before I can get my discharge. If I
come back empty-handed to the only court with which I
have to deal, an order from the district court direct to me
will not excuse me. I can take my orders only from the
probate court. The district court may speak to me only
through the probate court. By section 299, probate act,
the only way a judgment of the district court can reach me
is by having a copy sent to the probate court and there
entered as the judgment of the probate court. Then I am
able to settle with my court, for I can cite its own judgment
as my authority for surrendering the estate; but this can
only be done in the case of an appeal, or perhaps in the dif-
ferent actions permitted against me, but of which, in any
event, this is not one. All of the aforesaid acts were in
force before the execution of the instrument which is the
foundation of this action, and ever since have been and still
are in force.

The plaintiff states, of his own knowledge he knows that
the deceased died intestate; that the public administrator of
Pima county duly applied for letters of administration on
the estate of the deceased, and that the probate court, by
an order duly entered and filed, granted such letters, and he
stated other facts going to show that the proceedings of the

probate court in the premises were all in regular accordance with law, and that he had full notice of all proceedings in this matter in the probate court.

The question then is, Had he the right to ignore all those proceedings of the probate court, to neglect his protest, waive his appeal, and file his original bill in the district court praying that the order of the probate court be considered a nullity, and that the whole estate be removed from the control of the administrator and be given to heirs? I think it is clear that he could not. The district court has no power to entertain such a bill. Plaintiff showed, by his own bill, that the administrator was, *prima facie*, rightfully in the possession of the estate and administering upon it according to law. He alleged no reason why all the regular and orderly proceedings of the probate court should be set aside, ignored, made absolutely null and void, except to allege that he himself, by virtue of a certain document, was the rightful heir to the estate, and should be put in possession thereof.

But the twenty-ninth section of the probate act tells him what he should do under such circumstances; he should have exhibited his testamentary document to the probate court, and asked to have it admitted as the will of the deceased. Administration was still going on in the probate court, and there was a special provision of law for such a case as plaintiff said he had, namely, a document disposing of an estate which had been declared intestate. If the probate court admitted it as good, it would have revoked the letters of administration of the public administrator, and put the plaintiff, or some proper person, in possession. If the court ruled against him, then he could have gone to the district court on appeal, and he would have been entitled to a hearing; but he might just as well go to the supreme court, or the court of another territory, with his claim, as to go into the district court by original bill. The law has created a special court to consider such claims, and has given it exclusive original jurisdiction of such matter. The only grant of original probate jurisdiction found in our law is to the probate courts, and the statute fixing the jurisdiction of the district courts excludes it therefrom.

The sections are as follows:

"Sec. 12. In addition to the jurisdiction of the district courts as conferred by the constitution and laws of the United States, their jurisdiction shall be of two kinds: first, original; second, appellate.

"Sec. 13. Their original jurisdiction shall extend to all civil cases where the amount exceeds one hundred dollars exclusive of interest, and to all criminal cases not otherwise provided for. In cases involving the title or possession of real property, and in all issues of fact joined in the probate court and brought into this court as provided by law, their jurisdiction shall be unlimited.

"Sec. 14. The appellate jurisdiction of these courts shall extend to hearing on appeal. * * * 2. An order or judgment of the probate court in the cases prescribed by statute." Comp. Laws, 376.

This shows that the probate court has exclusive original jurisdiction at law of all probate matters, and it is only where a matter can not be heard and determined by the law courts that the powers of a court of equity may be invoked. If a claimant neglects or refuses to appear in the proper court, it is his own lookout, and even the power of a court of equity can not save him. The district court could not hear the claimant in this case upon original bill, even if he had been beyond seas at the time this administration was granted, and had come back with a perfectly regular will— nay, not even though his will were good, and a forged one had been probated in his absence, the administration being still in progress. An application to a court of equity to practically set aside an order of a probate court giving an estate into the hands of a public administrator, differs in no respect in principle from an application to set aside the probate of a will. It is an application, in each case, to review and reverse upon original bill the action of a probate court in a matter where that court has exclusive original jurisdiction.

In the case of *Broderick's Will*, 21 Wall. 503, there was an application to a court of equity to annul the action of a probate court in admitting a will to probate. As stated by Wallace, it was "a suit in equity brought by the alleged heirs at law of David C. Broderick, late United States sen-

ator from California, to set aside the probate of his will and have the same declared a forgery, and to recover the said Broderick's estate, much of which consisted of lands now comprised in the thickly settled portions of the city of San Francisco." It is evident from this that it was a great case. It was carried to the supreme court of the United States. The bill charged fraud in the probate, fraud in the will, fraud in the sale, fraud in the purchasers, fraud from beginning to end, and that the plaintiffs were beyond seas at the time, and knew not of the fraud until administration had closed in the probate court, wherefore they had no possible relief at law, and therefore prayed for it in equity. Could a stronger case be presented ? Yet the bill was demurred to, demurrer sustained, and the judgment affirmed by the supreme court of the United States.

The first ground taken was that the equity courts had no jurisdiction, the matter being vested exclusively in the probate courts. In considering this point, the court declares as follows: "As to the first point, it is undoubtedly the general rule, established both in England and in this country, that a court of equity will not entertain jurisdiction of a bill to set aside a will or the probate thereof. The case of *Kerrich* v. *Bransby*, 7 Bro. C. P. 437, decided by the house of lords in 1727, is considered as having definitely settled the question. \* \* \* And one of the principal reasons assigned by the equity courts for not entertaining bills on questions of probate is, that the probate courts themselves have all the powers and machinery to give full and adequate relief."

The court quotes with approval the language of Lord Lyndhurst in *Allen* v. *MacPherson*, 1 Phill. 133; S. C. on appeal in the house of lords, 1 H. L. Cas. 191. In that case a bill was filed in chancery to annul the action of a probate court in admitting a codicil, charged to have been obtained through fraud. The bill was demurred to and dismissed. The judgment of the court sustaining the demurrer was affirmed. " If," says Lord Lyndhurst, in the house of lords, speaking of the action of the probate court, "an error has been committed in this or any other respect, which I am very far from supposing, that would not be a ground for coming to a court of equity. The matter should have been set right upon appeal. But the present is an attempt to review the

decision of the court of probate, not by the judicial committee of the privy council, the proper tribunal for that purpose, but by the court of chancery. I think this can not be done. It was formerly, indeed, considered that fraud in obtaining a will might be investigated and redressed in a court of equity, but that doctrine has long since been overruled." 1 H. L. Cas. 209.

The court also quotes with approval the language of the supreme court of California in the case of *State of California* v. *McGlynn*, 20 Cal. 233, 268, as follows: "Upon examining the decisions of the supreme court of the United States, and of the courts of the several states, it will be found that they have uniformly held that the principles established in England, apply to and govern cases arising under the probate laws of this country, and that in the United States whenever the power to probate a will is given to a probate or surrogate's court, the decree of such court is final and conclusive, and not subject, except on appeal to a higher court, to be questioned in any other court, to be set aside or vacated by the court of chancery on any ground."

The following language is also used by the court at page 517: "The question recurs, Do the facts stated in the present bill lay a sufficient ground for equitable interference with the probate of Broderick's will or for establishing a trust as against the purchasers of his estate in favor of the complainants? On the establishment or non-establishment of the will depended the entire right of the parties, and that was a question entirely and exclusively within the jurisdiction of the probate court. In such a case, a court of equity will not interfere, for it has no jurisdiction to do so. The probate court was fully competent to afford adequate relief." The last words do not mean that the probate court was open at the time the action was begun. It is admitted that it was closed at that time, as to the complainants, but that it had been opened to them the necessary time, and that it was *laches* on their part not to apply in time; that there was nothing in their claim that they did not really have *actual* notice of the proceedings in the probate court, being beyond seas at the time, that the requisite *legal* notice was given by publication, etc., and that they were bound by it, otherwise all proceedings *in rem* would be unsettled.

The particular point decided in the foregoing case was that the action of the probate court, in determining that a valid will *had* been made, could not be reviewed in a court of equity on original bill, but on the same principle the court must have necessarily declared that it could not interfere if the decision had been that a valid will had *not* been made, as was the case here. The principle recognized is, that the review can not be had on original bill, but must be by appeal. In this case the probate court, having regularly acted concerning this estate, and the plaintiff not having appealed, being guilty of *laches* to that extent, but still having his remedy at law, under section 98, probate act, he did not present a case, as upon a will, of which the court had jurisdiction, and the bill was properly dismissed.

It has been urged that this is a case for the exercise of the large, broad, general principles of equity, that there was a manifest intention here to pass the property in question to plaintiff, and that it is the duty of a court of equity to in some way carry out that intention, that if this instrument is held to be a will, the intention of the deceased will be defeated, because the instrument can not stand the test of the probate court, there being but one witness, and the statute of wills requiring two, and therefore the court must endeavor in some way to give force to this instrument, otherwise the plaintiff will be left without relief.

There are limitations, however, even upon the jurisdiction of a court of equity. Equity courts have extraordinary powers, but they are not beyond the reach of statute law, neither are they independent bodies, careering at will though the vast domain of law with no fixed rules for their guidance. The system of jurisprudence administered so grandly by Cardinal Wolsey, so cautiously by Sir Thomas More, defended by Lord Ellesmere, systematized by Lord Bacon, exalted by the genius of Lord Nottingham, the father of equity, defined by the exquisite discernment of Lord Hardwicke, developed, perfected, and ennobled by the commanding powers of such men as Mansfield, Camden, Thurlow, Elden, Marshall, Kent, Story, and other worthy compeers, will not be found devoid of definite rules of procedure.

If we look for rules to guide us in the present case we shall not fail to find them; for instance: he who asks equity

must do equity; he who appeals to equity must submit to equity, and to obtain relief he must show that the equities are in his favor; that his equities overbalance those on the other side. But where are the ʳsuperior equities of the plaintiff in this case? Why must he be favored in any especial manner to the prejudice of the heir he seeks to disinherit? What has the natural or legal heir done that not only *his* equities but his *legal rights* must be set aside?

The plaintiff, in form, asks equity for himself, but in fact he has appealed to a court of equity to judge in conscience between him and the heir at law, to weigh the equities in each case, and declare whether or not the conscience of the heir at law is bound by this defective and illegal instrument of the ancestor; to prevail, he must not only show as *good* a right to the property as that of the legal heir, but he must show a *better* one. The heir is in possession. The administrator is holding for him. The plaintiff seeks to oust him, and unless he shows the *better* right he must fail, for *in æquali jure melior est conditio possidentis;* the heir is defending, and *in æquali jure melior est conditio defendentis* (Broom's Max. 564); the heir is first in the field, and *qui prior est in tempore, potior est in jure;* the plaintiff seeks to destroy the legal succession by a private compact, but *fortior et potentior est dispositio legis quam hominis;* he seeks to set aside the strict law of the case in favor of his equity, but "where the equity is equal, the law must prevail;" he asks relief against the law, but "where the law has determined a matter, with all its circumstances, equity can not intermeddle against the positive rules of law." Fonbl. Eq., b. 1, c. 1, p. 83. "And equity will not interfere in such cases, notwithstanding accident or unavoidable necessity." Id. He says that under the rules of law he has no relief, but Lord Talbot declares, "Where a particular remedy is given by law, and that remedy is bounded and circumscribed by particular rules, it would be very improper for this court to take it up where the law leaves it and extend it further than the law allows." Cas. Temp. Talbot, 174; he says deceased intended to name him as his heir, but if a man leaves his will unfinished there can be no relief. See half a dozen cases cited, 1 Story Eq. Jur., sec. 61, c. 111; he says the strict letter of the statute defeats the will of the deceased, but "where a rule

either of the common or the statute law is direct and governs the case with all its circumstances, or the particular point, a court of equity is as much bound by it as a court of law, and can as little justify a departure from it." 1 Story's Eq. Jur., sec. 64, citing *Kemp* v. *Pryor*, 7 Ves. 249; 2 Bac. Abr., Court of Chancery, C. And see *Habergham* v. *Vincent, supra.*

Our statute says distinctly the instrument in the case at bar shall not stand as a will, for lack of witnesses; nor, I think, as a contract, because the maker is dead, and it could not be enforced against him during his life; and yet it is either a contract or a will, one or the other, beyond all question; so that it is very far from being clear that the plaintiff has any equities at all under this instrument. No equity can arise under it as a contract, for our statute forbids an action on it, and "if the law prohibits a thing to be done, equity can not enjoin the contrary." 1 Story's Eq. Jur., sec. 64.

No equity can arise on the instrument as a will, for as such it is defectively executed, and Smith, in stating some of the elementary principles of equity jurisprudence, gives the following illustration: "Thus no relief will be afforded to the legatees or devisees under a will defectively executed, for, being mere volunteers, they have as little equity as the heir or next of kin, or even less, inasmuch as *fortior et æquior est dispositio legis quam hominis,* Co. Lit. 388 a, and therefore the legal right which has vested in the latter will not be taken away, as the maxim is, that 'where the equity is equal the law must prevail.'" Smith's Man. Eq., 11th Lond. ed., 38–9.

A will is not executed until it is signed, duly attested, and declared or published so as to be rendered complete and operative. See Burr. Law Dict., "Execution;" Bouv. Law Dict.; 4 Kent's Com. 450, 513, and notes; Bla. Com. 376.

This matter of disposing of property by will has never been recognized by any government as a natural right. It has always been looked upon as a matter of public policy, to be granted as a *privilege,* subject to such conditions for its exercise as the law-making power chooses to impose, or to be withheld altogether if it is considered the interest of the state will be promoted thereby. And so we find in-

numerable varieties of statute law on the subject, not only
denying the head of the family the privilege of making a
will, but cutting off all right of natural succession. Giving
not only all the property to the king, but also the wife and
all unmarried children, so that to escape it the children
were married in infancy, Esprit des Loix, lib. v., c. 14., is
one extreme in legislation on this subject. This doctrine
of escheats, though modified, has never been fully surren-
dered by any government. It exists to-day in this terri-
tory. It is the only part of the law of succession which all
nations have always in some shape preserved. All improve-
ments in the law of succession consist merely in concessions
by governments of parts of this asserted right. The right
of escheat is a corollary of the doctrine that everything be-
longed primarily to the crown, and that the subject enjoyed
even a life estate in property only by favor. For the doc-
trine, see Crag. de Jur. Feud., 233, cited in Wright's Ten-
ures, 59.

The people everywhere have always pressed for an in-
crease of rights over property. At first they asked only
that it might descend to their natural heirs. Under the
feudal law, when this privilege was granted it was condi-
tional on the lord's choosing the heir, or fine, fealty, hom-
age, petition, proclamation—whence heriots, relief, primer
seisin, etc. Gilbert's Ten. xvi. Then the people claimed
the right to name the heir themselves—in other words, to
devise the property to whomsoever they pleased; but this
point is not even yet everywhere yielded. It does not yet
exist in France or in Scotland as to realty. It is only dur-
ing the reign of the present queen that it has been fully
granted in England as to realty, and even as to personalty
it is only in a period comparatively recent that the privi-
lege has been universally obtained even in England. Redf.
on Wills, c. 1, sec. 5, note 10.

In at least one of our states, Louisiana, the privilege is
not yet fully granted, and in this territory it is only within
the last few years that it has been conceded; so that the
plaintiff in this case must remember that he has no natural
or inherent equities in this matter. He is a stranger in blood
to the ancestor. All the rights he can possibly have herein
depend upon a very recent statute, and this statute being

the very last and furthest advance made in granting the power to prefer strangers in blood to the natural heir, he must show a strict compliance with all the essentials of the statute to acquire any standing at all in court. The *equities* are in favor of the natural or legal heir. These heirs are in possession, and the plaintiff can not oust them except by showing not only an equitable claim, but a legal right to do so. This doctrine is not new. It comes down to us even from the old black-letter days; but though born of a former age, its sound principles of right and justice keep it ever green and vigorous, and it speaks to us to-day with undiminished power from the pages of our latest and highest authorities.

In the tenth edition of Story's Equity it stands in the text as follows: "Equity will not interfere to give effect to an imperfect will against an innocent heir at law, for, as heir, he is entitled to protection, whatever might have been the intent of the testator, unless his title is taken away according to the rules of law." 1 Story's Eq. Jur., sec. 106, 10th ed. As authority for this proposition, Story cites Com. Dig., Chancery, 3, F, 6, 7, 8; 1 Fonbl. Eq., b. 1, c. 4, sec. 25, notes *k* and *n;* Grounds and Rudiments of the Law, M. 167, p. 128, ed. 1751.

The rules of law governing this case are set down in our book of statutes: 1. That the plaintiff can not acquire this estate by a contract, or in any way except by will; 2. That he can not acquire it by will, except by a good will, duly signed, attested, and probated. Equity can not play fast and loose with the essentials of statute law. The legislature is the law-making power, not the courts. The matter of witnesses to a will is not within the maxim, *De minimis non curat lex.* It is one of the primary, essential, indispensable conditions to a valid will, and a court of equity has no more power to dispense with it or avoid it, than it has to dispense with or avoid the whole statute of wills, or any other statute.

I do not then see that plaintiff made out any case for any relief in the court below. He did not ask legal relief as upon a claim against the estate in the sense of the probate act, and if he had, or if the court might have entertained the case for that purpose, he did not show any such

claim, and therefore did not state facts sufficient to constitue a cause of action in that regard. He could have no relief as upon a contract, for the only contract he set up was one on which our statute says no action can be founded; therefore the complaint failed to state facts sufficient to constitute a cause of action in that regard. He could have no relief as upon a will, for he did not produce a regularly probated will, nor even a properly executed will, and the court has no jurisdiction to establish a will, nor give any relief on one under the circumstances, even if a perfect will had been produced, for that court has no original jurisdiction of wills, and besides, administration was still proceeding in the probate court, a court which had full power to afford him legal relief, and to which he was bound to first submit his claim, and apply to the district court, if at all, only by appeal from the judgment of the probate court.

While limiting the reasons to the facts in this case, I do not mean to intimate any doubt about the law going as far as in this case cited. It is sufficient for present purposes to show that it covers this case. The doctrine in the case of *Broderick's Will*, 21 Wall. 503, evidently goes much further, the court being irresistibly led thereto by the controlling fact that the jurisdiction invoked is by law placed exclusively in another tribunal.

In looking over this opinion, I notice in some places what may be thought a little impetuosity of expression. I have not time, pressed as I am with other official duties, to recast the language; but however it may read, it is written in a spirit of entire respect for the judgment of the majority of the court, orally rendered, their written opinion not having yet been, so far as I know, prepared. This is the only case in which I have felt obliged to dissent from their judgment, and it is because of the great respect I know is due and accorded to their opinion, in any case passed upon by them, that I have taken the pains to try to show the reasons which led me to a different conclusion.

I am therefore of the opinion that the judgment of the court below sustaining the demurrer and dismissing the bill should be affirmed.